Scott R. Hoyt (SBN 14558)
John P. Mertens (SBN 14522)
PIA ANDERSON MOSS HOYT
136 East South Temple, Suite 1900
Salt Lake City, UT  84111
Telephone: 801.350.9000
Facsimile: 801.350.9010
shoyt@pamhlaw.com
jmertens@pamhlaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| ZIBALSTAR, L.C., a Utah Limited Liability Company; BRIGHTON PLACE, L.C., a Utah Limited Liability Company; TMBRS PROPERTY HOLDINGS, LLC, a Utah Limited Liability Company; SEVEN PEAKS WATERPARK PROVO, INC., a Utah Corporation; 1481 DEWEY NY LLC, a New York Limited Liability Company; ROC 1 Properties, L.C., a Utah Limited Liability Company; JUNCTION MARKET ALPINE, L.C., a Utah Limited Liability Company; HENRY'S FORK HEIGHTS, L.C., a Utah Limited Liability Company; DERBYSHIRE HOLDINGS, LLC, an Oklahoma Limited Liability Company Registered to do Business in Utah; JUNCTION MARKET FAIRVIEW, L.C., a Utah Limited Liability Company; JUNCTION MARKET SCIPIO, L.C., a Utah Limited Liability Company; JUNCTION MARKET ISLAND PARK, L.C., a Utah Limited Liability Company; JUNCTION MARKET SPRINGDALE, L.C., a Utah Limited Liability Company; JUNCTION MARKET PANGUITCH, L.C., a Utah Limited Liability Company; BLUE HOUSE FILLMORE, L.C., a Utah Limited Liability Company; WINCHESTER BUSINESS PARK, L.C., | **COMPLAINT**<br>[DEMAND FOR JURY TRIAL]<br><br><br>Case No:  2:18-cv-00418-BSJ |

COMPLAINT

a Utah Limited Liability Company; and REDWOOD ROAD HOLDINGS, L.C., a Utah Limited Liability Company, 17 EAST MAIN NY,LLC, a Utah limited liability company; SUNSET APARTMENTS PLACE, L.C., a Utah Limited Liability Company; WHITE STALLION, L.C., a Utah Limited Liability Company, MCKINLEY COURT PLACE, L.C., a Utah Limited Liability Company, and GARY BRINTON, an Individual;

Plaintiffs,

vs.

THEODORE L. HANSEN, an Individual; BRANDEN HANSEN, an Individual; JEFFREY MUNOZ, an Individual; DAVID TURNER, an Individual; CHARLES HANNA, an Individual; PAUL HALLIDAY, JR., an Individual; DAVID ODENATH, an Individual; MIKE GRANDE, an Individual; ERIC MANRIQUEZ, an Individual; ROBERT GARCIA, an Individual; LORIN QUAYLE, an Individual; ANDREW WARWOOD, an individual; JACOB PETERSON, an individual; PARKER ENLOE, an individual; RAY WELLER, an Individual; LESTER PERRY, an Individual; SAMUEL FAIRCHILD, an Individual; DAVID LARSEN, an Individual; ESTRELLA GROUP LLC, a Utah Limited Liability Company; ESTRELLA OK LLC, an expired Utah Limited Liability Company; ESTRELLA P M LLC, a Utah Limited Liability Company; ZURICH HOLDINGS LIMITED LIABILITY COMPANY, an expired Utah Limited Liability Company; HEATHROW HOLDINGS, LLC, a Texas Limited Liability Company; FLINTSHIRE HOLDINGS, LLC, an expired Utah Limited Liability Company; LOW COST RENTALS, LLC, a Utah Limited Liability Company; JUNCTION MARKET VII, LLC, a Utah

COMPLAINT

- 2 -

Limited Liability Company; BANK OF THE WEST, a California Corporation; BLUE FUN GROUP, LLC, a Utah Limited Liability Company; and JOHN DOES PERSONS and ENTITIES 1 through 400,

Defendants.

Comes now Plaintiffs ZibalStar, L.C., Brighton Place, L.C., TMBRS Property Holdings, LLC, Seven Peaks Waterpark Provo, Inc., 1481 Dewey NY LLC, ROC 1 Properties, L.C., Junction Market Alpine, L.C., Henry's Fork Heights, L.C., Derbyshire Holdings, LLC, Junction Market Fairview, L.C., Junction Market Scipio, L.C., Junction Market Island Park, L.C., Junction Market Springdale, L.C., Junction Market Panguitch, L.C., Blue House Fillmore, L.C., Winchester Business Park, L.C., Redwood Road Holdings, L.C., 17 East Main NY, LLC, Sunset Apartments Place, L.C., White Stallion, L.C., McKinley Court Place, L.C., and Gary Brinton (collectively "*Plaintiffs*"), who allege as follows against Defendants Theodore L. Hansen, Branden Hansen, Jeffrey Munoz, David Turner, Charles Hanna, Paul Halliday, David Odenath, Mike Grande, Eric Manriquez, Robert Garcia, Lorin Quayle, Andrew Warwood, Jacob Peterson, Parker Enloe, Ray Weller, Lester Perry, Samuel Fairchild, David Larsen, Estrella Group LLC, Estrella OK LLC, Estrella P M LLC, Zurich Holdings Limited Liability Company, Heathrow Holdings, LLC, Flintshire Holdings, LLC, Low Cost Rentals, LLC, Junction Market VII, LLC, Bank of the West, Blue Fun Group, LLC, and John Does 1 to 400, (all Defendants collectively, together with certain non-parties,[1] "*Defendants*"), and respectfully show the Court:

---

[1] Plaintiffs reserve the right to add Robert Conte, Courtside Condominiums, L.C., WCMF, Inc., and Trophy Properties NV, LLC ("*Conte Parties*") as defendants. *See* ¶¶ 24, 41, 48, 49. For purposes of the narrative description of events, these parties are included in the term Defendants, though they are not named as parties to the complaint at this time.

COMPLAINT

## I.   PARTIES

1.      Plaintiff ZibalStar, L.C. ("*ZibalStar*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. ZibalStar, L.C. is a Member of TMBRS Property Holdings, LLC ("*TMBRS*"). ZibalStar leases (with option to purchase) real properties known as Highland Oaks in Fredericksburg, Texas ("*Highland Oaks Property*"), Manzana Grove in Fort Worth, Texas ("*Manzana Grove Property*"), San Jacinto Apartments in Jackpot, Nevada ("*San Jacinto Property*"), Courtside Condominiums in Orem, Utah ("*Courtside Property*").

2.      Plaintiff Brighton Place, L.C. ("*Brighton*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Brighton owned real property known as the Sierra Pointe Apartments, located in Tulsa, Oklahoma ("*Sierra Pointe Property*").

3.      Plaintiff TMBRS is a Utah limited liability company with its principal place of business in Utah County, State of Utah. TMBRS leases or leased, (with option to purchase) the following properties from Conte (defined below) or an entity Plaintiffs are informed and believe to be owned and/or controlled by him: Tres Palms Apartments in Fort Worth, Texas ("*Tres Palms Property*"), Four Oaks Apartments in Tulsa, OK ("*Four Oaks Property*"), Silverwood Apartments in Tulsa, OK ("*Silverwood Property*"), Whispering Oaks Apartments in Tulsa, OK ("*Whispering Oaks Property*"), McKinley Court Apartments in Tulsa, OK ("*McKinley Property*"), The Cove Apartments in Tulsa, OK ("*Cove Property*"), and Bradford Townhomes in Tulsa, OK ("*Bradford Property*" and with the Tres Palms Property, the Four Oaks Property, the Silverwood Property, the Whispering Oaks Property, the McKinley Property, and the Cove Property, the "*TMBRS Properties*").

4.      Plaintiff Seven Peaks Waterpark Provo, Inc. ("*Seven Peaks Provo*") is a corporation organized and existing under the laws of the State of Utah with its principal place of business in Utah County, State of Utah. Seven Peaks Provo leases (with option

to purchase) the Seven Peaks Waterpark Provo in Provo, Utah ("***Seven Peaks Provo Property***").

5.      Plaintiff 1481 Dewey NY, LLC ("***Dewey***") is a New York limited liability company registered to do business in Utah, with its principal place of business in Utah County, State of Utah. Dewey owns or owned commercial and residential properties in Rochester, New York ("***Dewey Properties***").

6.      Plaintiff ROC 1 Properties, L.C. ("***ROC***") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. ROC owns or owned residential properties in Rochester, New York ("***ROC Properties***").

7.      Plaintiff Junction Market Alpine, L.C. ("***Junction Alpine***"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Junction Alpine owns a gas station/convenience store in Alpine, Utah ("***Alpine Station***").

8.      Plaintiff Henry's Fork Heights, L.C. ("***Henry's Fork***"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Henry's Fork owned recreational cabins, land, lodging facilities and a library facility in Island Park, Idaho ("***Henry's Fork Property***").

9.      Plaintiff Derbyshire Holdings, LLC ("***Derbyshire***") is an Oklahoma limited liability company registered to do business in Utah, with its principal place of business in Utah County, State of Utah. Derbyshire owns Southern Oaks Apartments located in Oklahoma City, Oklahoma ("***Southern Oaks Property***").

10.     Plaintiff Junction Market Fairview, L.C. ("***Junction Fairview***") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Junction Fairview owns a gas station/convenience store in Fairview, Utah ("***Fairview Station***").

11.     Plaintiff Junction Market Scipio, L.C. ("***Junction Scipio***") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Junction Scipio owns a gas station/convenience store in Scipio, Utah ("***Scipio Station***").

12.     Plaintiff Junction Market Island Park, L.C. ("***Junction Island Park***"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Junction Island Park owned a gas station/convenience store in Island Park, Idaho ("***Island Park Station***").

13.     Plaintiff Junction Market Springdale, L.C. ("***Junction Springdale***"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Junction Springdale owns a gas station/convenience store in Springdale, Utah ("***Springdale Station***").

14.     Plaintiff Junction Market Panguitch, L.C. ("***Junction Panguitch***"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Junction Panguitch owns a gas station/convenience store/truck stop hotel in Panguitch, Utah ("***Panguitch Station***").

15.     Plaintiff Blue House Fillmore, L.C. ("***Blue House***") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Blue House owned a hotel in Fillmore, Utah ("***Blue House Property***").

16.     Plaintiff Winchester Business Park, L.C. ("***Winchester***"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Winchester owned an office warehouse condominium project in Orem, Utah ("***Winchester Property***"). Winchester is the sole member of Dewey and Derbyshire.

17.     Plaintiff Redwood Road Holdings, L.C. ("***Redwood***") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Redwood owned a piece of raw land on Redwood Road in Salt Lake County ("***Redwood Property***").

COMPLAINT

18.     Plaintiff 17 East Main NY, LLC ("*East Main*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. East Main owns or owned a five-story office building in Rochester, NY ("*East Main Property*").

19.     Plaintiff Sunset Apartments Place, L.C. ("*Sunset*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. Sunset owns two apartment complexes in Las Vegas, Nevada ("*Sunset Properties*").

20.     Plaintiff White Stallion, L.C. ("*White Stallion*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. White Stallion owns a water park in Porter, Indiana ("*Seven Peaks Porter Property*").

21.     Plaintiff McKinley Court Place, L.C. ("*McKinley Court*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. McKinley Court had a Purchase Contract to purchase the McKinley Property.

22.     Plaintiff Gary Brinton ("*Brinton*") is a citizen of the State of Utah. Brinton is the president of Seven Peaks Provo, and the manager of TMBRS.[2] Brinton also owns and manages Vitade Property Solutions ("*VPS*"), the manager of each of the other entity Plaintiffs besides Seven Peaks Provo and TMBRS. Therefore, Brinton exercises management control over each entity Plaintiff, and references to "Plaintiffs" refers to harm to Brinton and his collective entities.

23.     Each Plaintiff has standing and capacity to file this lawsuit, which includes the enforcement of a substantive federal right.

24.     Non-party[3] Robert Conte ("*Conte*") is a citizen of the State of Nevada. Conte, personally and as part of an enterprise, has conspired with the Defendants to defraud

---

[2] Brinton has agreed to assign his interest in TMBRS to Conte and will do so as soon as Conte acknowledges his obligations under his and Brinton's settlement agreement.
[3] Plaintiffs have settled their claims against Conte and are not seeking relief herein against him, however Conte has challenged the validity of their settlement, and should it be determined that their settlement is invalid, Plaintiffs will amend this complaint to include Conte as a defendant. Conte's involvement is also necessary to establish the connection and conspiracy amongst the Defendants.

COMPLAINT

Brinton. Conte participated in multiple real property transactions with Brinton, and through these transactions has attempted to evade taxes and defraud Brinton. Conte was a ringleader in the enterprise, and participated by: i) misrepresenting the value of properties sold to Plaintiffs; ii) financing many of the purchases of property by Plaintiffs; iii) influencing management control of Plaintiffs' properties so as to put managers in place loyal to himself; iv) colluded with Grande, Manriquez, and Garcia (defined below) to manage properties so as to make payment of lease payments impossible; v) attempted and is attempting to regain these properties due to defaults which he engineered; vi) refused to close on exchange deals causing damages to Plaintiffs in the form of the loss of tax benefits; and vii) refused to provide agreed-upon financing for rehabilitation of properties.

25.     Defendant Theodore L. Hansen ("*Hansen*") is a citizen of the State of Utah. Hansen, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Hansen's role in the enterprise was to fraudulently persuade Brinton to move forward with the Transactions (defined below) by exaggerating the value of properties and of Hansen's ability to procure financing through his friends and contacts. Hansen also convinced Brinton to purchase personal property for him, and he promoted and supported property managers and gas station managers who were overstating results and embezzling proceeds. Hansen was ultimately in charge of managing all properties and gas stations addressed herein. Hansen also promoted the Forthcoming Real Estate Transaction (defined below), which served as a fraudulent inducement for all of the above. Hansen was previously charged with 7 felony counts and convicted of attempting to sell unregistered securities, was on probation at the time of the events alleged herein and was required to make specific written disclosures to persons he did business with at the time, including that he had as of 2016, over $48 million in unsatisfied judgments against him. Hansen did not make these disclosures, but rather concealed

material facts such as the outstanding judgments, to induce Plaintiffs to do business with him.

26.     Defendant Branden Hansen ("*Branden Hansen*") is a citizen of the state of Utah. Branden Hansen is Hansen's brother. Branden Hansen, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Working under Hansen, Branden Hansen was an executive manager over the various gas station properties owned by Plaintiffs, supervising Quayle (defined below). In this role, Branden Hansen oversaw management practices including allowing creditors of Hansen to receive free gasoline, and allowing Quayle, Turner, and Munoz to divert cash receipts to their own use and/or that of the other Defendants.

27.     Defendant Jeffrey Munoz ("*Munoz*") is a citizen of the state of Utah. Munoz is the live-in boyfriend of Defendant Hansen's wife's sister. Munoz, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Munoz was the executive manager in charge of the real estate holdings (excluding gas stations/convenience stores). Munoz knew of and participated in the mismanagement of real properties belonging to Plaintiffs so as to divert assets and income therefrom to Defendants, and so as to force Plaintiffs into default.

28.     Defendant David Turner ("*Turner*") is a citizen of the state of Utah. Turner, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Turner was entrusted to be treasurer of all Plaintiff entities and put in charge of managing the financial resources of Plaintiffs. Turner moved and misappropriated Plaintiffs' funds through embezzlement, diversion, and conversion of funds so as to divert funds, assets and income from Plaintiffs to Defendants, and failed to make timely lease and mortgage payments on behalf of Plaintiffs so as to force Plaintiffs into default.

29.     Defendant Charles Hanna ("*Hanna*") is a citizen of the state of Utah. Hanna, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Hanna converted and embezzled credit card receipt payments from customers of Plaintiff Blue House. Hanna misappropriated Blue House funds through embezzlement, diversion, and conversion of funds so as to divert funds, assets and income from Plaintiffs to Defendants, so as to force Plaintiffs into default on other mortgage/lease obligations.

30.     Defendant Paul Halliday, Jr. ("*Halliday*") is a citizen of the state of Utah. Halliday, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Halliday held himself out as assembling an IRS Code 501(c)(3) organization, to be financed by wealthy individuals that would support low-income housing by making loans to Plaintiffs to assist in the acquisition, rehabilitation, and stabilization of projects. Halliday misrepresented the state of this charitable organization and made loan commitments to Plaintiffs which he did not honor, causing expense, delay, and damage.

31.     Defendant David Odenath ("*Odenath*") is a citizen of the state of Florida. Odenath, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Odenath held himself out as assembling a lucrative real estate transaction, whereby Plaintiffs, once they owned 10,000 doors,[4] could sell their property portfolio to a large entity controlled by John Hantz. According to Odenath, Mr. Hantz's organization had set aside $750,000,000 of a $1,000,000,000 investment round to purchase these properties at favorable values at least double what Plaintiffs were paying.

32.     Defendant Mike Grande ("*Grande*") is a citizen of the state of New York. Grande, personally and as part of an enterprise, has conspired with the other Defendants to

---

[4] Colloquially, the number of "doors" means the number of separate apartment units owned by a particular real estate investor.

COMPLAINT

- 10 -

defraud Brinton. Grande purposely mismanaged real properties in New York belonging to Plaintiffs Dewey, ROC, and East Main so as to divert assets and income therefrom to Defendants, and so as to force Plaintiffs into default. This has allowed and will allow Conte, as mortgagee, to foreclose on them. Grande habitually converted Plaintiffs' assets to his own use. In his role in the enterprise, Grande nominally reported to Rosemary Inocencio ("*Inocencio*"), but actually reported to Munoz.

33.    Defendant Eric Manriquez ("*Manriquez*") is a citizen of the state of Oklahoma. Manriquez, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Manriquez mismanaged real properties in Oklahoma[5] belonging to Plaintiffs so as to divert assets and income therefrom to Defendants, and so as to force Plaintiffs into default. This has allowed and will allow Conte, as mortgagee/Landlord, to foreclose/evict them. Manriquez, both before and after Plaintiffs purchased properties, overstated revenues and occupancy by: i) booking revenues for items owed by departing tenants that were not likely to be collected; ii) booking rent owed by departing tenants who broke their lease, and rent paid by replacement tenants, as separate occupancies. Manriquez had contractors work on his own properties and billed Plaintiffs. Manriquez also diverted prospective tenant calls to other properties. In addition, Manriquez embezzled and converted Plaintiffs' laundry revenues to his own personal and private use. Manriquez nominally reported to Inocencio, but actually reported to Munoz.

34.    Defendant Robert Garcia ("*Garcia*") is a citizen of the state of Texas. Garcia, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Garcia mismanaged the Highland Oaks Property belonging to Highland Oaks so as to divert assets and income therefrom to Defendants, and so as to force Plaintiffs into default. This has allowed and will allow Conte, as mortgagee/landlord, to

---

[5] The mismanaged properties are Four Oaks, Silverwood, Whispering Oaks, McKinley Court, The Cove, Bradford Townhomes, and Sierra Point.

foreclose/evict them. Garcia also diverted Plaintiffs' employees to work on his own projects. Garcia nominally reported to Inocencio, but actually reported to Munoz.

35.     Defendant Lorin Quayle ("*Quayle*") is a citizen of the state of Utah. Quayle, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Quayle mismanaged the gas station properties in Utah and Idaho belonging to Plaintiffs so as to divert assets and income therefrom to Defendants, and so as to force Plaintiffs into default. This has allowed and will allow Conte, Branden Hansen, and/or Perry (defined below), as mortgagee/landlord, to foreclose/evict them. Quayle reported to Branden Hansen.

36.     Defendant Andrew Warwood ("*Warwood*") is a citizen of the State of Utah. Warwood, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Defendant Warwood is the branch manager of the Blackstone Branch of Bank of the West. Defendant Warwood participated in an illegal check kiting scheme using Plaintiffs' bank accounts.

37.     Defendant Jacob Peterson ("*Peterson*") is a citizen of the State of Utah. Peterson, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Peterson is the Assistant Manager of the Blackstone Branch of Bank of the West.

38.     Defendant Parker Enloe ("*Enloe*") is a citizen of the State of Utah. Enloe, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Enloe works for and allegedly owns a portion of lender Private Capital Group and WCMF, Inc. Enloe participated in the enterprise to defraud Brinton by conspiring with Conte to not deliver title to the Sunset Apartments in Las Vegas, Nevada, and by failing to record the $3 million lien on the Seven Peaks Lehi Fun Center that was authorized and approved by Conte for the purpose of collateralizing a line of credit for past and future lease payments so as to cure any of Plaintiffs' defaults under any property leases with

Conte. This purposeful and blatant failure on the part of Enloe has caused Conte to claim Plaintiffs are in default on lease payments so as to enable Conte to satisfy his goal of ripping these properties back from Plaintiffs and keeping Plaintiffs' option deposit money—all in furtherance of the enterprise goals.

39.     Defendant Ray Weller ("*Weller*") is a citizen of the State of Utah. Weller, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Weller participated in the enterprise to defraud Brinton by conspiring with Hansen and Perry to (1) deprive Junction Island Park of possession of its rightfully owned gas station/convenience store such that Junction Island Park has no access to any of the revenues from the operations to make payments to the mortgagee of the property —Perry; (2) deprive McKinley Court ownership and possession of certain property to which it is entitled to possess and own; (3) deprive Seven Peaks Provo of its revenue stream through a fraudulent misrepresentation of a loan transaction through a straw company (Blue Fun Group, LLC) caused to be established by Hansen with Hanna as its registered agent; (4) deprive Plaintiff ROC of four houses that were fraudulently sold by Hansen to Perry and/or Weller wherein Hansen retained all of the sales proceeds without Plaintiffs' knowledge; and (5) deprive McKinley Court of its earnest money funds on its purchase of the McKinley Property. Plaintiffs have resolved claims as between them and Weller concerning the McKinley Property and Junction Market Island Park. These claims remain in the complaint as there are other defendants liable for them

40.     Defendant Lester Perry ("*Perry*") is a citizen of the State of Utah. Perry, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Perry participated in the enterprise to defraud Brinton by conspiring with Hansen and Weller to (1) deprive Junction Island Park of possession of its rightfully owned gas station and convenience store such that Plaintiff Junction Island Park has no access to any of the revenues from the operations to make payments to the mortgagee of the property—

Defendant Perry; (2) deprive Plaintiff McKinley Court ownership and possession of certain property to which it is entitled to possess and own; (3) deprive Seven Peaks Provo of its revenue stream through a fraudulent misrepresentation of a loan transaction; (4) deprive ROC of four houses that were fraudulently sold by Hansen to Perry and/or Weller; and (5) deprive Brinton of its earnest money funds on its purchase of the McKinley Property. Plaintiffs have resolved claims as between them and Perry concerning the McKinley Property and Junction Market Island Park. These claims remain in the complaint as there are other defendants liable for them

41.     Non-party[6] Courtside Condominiums, L.C. ("*Courtside*") is a Utah limited liability company owned or controlled by Conte. It owns the Courtside Condominiums apartment complex ("*Courtside Condos*") in Provo, Utah, which it leases to ZibalStar.

42.     On information and belief, Defendant Samuel Fairchild ("*Fairchild*") is a citizen of the state of Utah or does business in Utah on a regular basis. Fairchild, personally and as part of an enterprise, has conspired with the other Defendants to defraud Brinton. Fairchild held himself out as assisting Odenath in assembling a lucrative real estate transaction, whereby Plaintiffs, once they owned 10,000 doors, could sell their property portfolio to a large entity controlled by John Hantz. According to Defendant Fairchild, Mr. Hantz's organization had set aside $750,000,000 of a $1,000,000,000 investment round to purchase these properties at favorable values at least double what Plaintiffs were paying.

43.     On information and belief, David Larsen ("*Larsen*") is a citizen of the State of Utah. Personally, and as part of an enterprise, Larsen has conspired with the other Defendants to defraud Brinton. Larsen has held himself out as a legitimate businessperson and experienced accountant, but instead serves as a front for Hansen, lending perceived credibility to Hansen's illicit activities.

---

[6] See FN 2, *supra*.

44.     Defendant Estrella Group LLC ("**Estrella Group**"), is a Utah limited liability company, with its principal place of business in Utah County, State of Utah, and offices at 50 West Canyon Crest Road, Alpine, Utah 84004 ("**Alpine Office**").

45.     Defendant Estrella OK LLC ("**Estrella OK**") is an expired Utah limited liability company with its principal place of business in Utah County, State of Utah, and with offices at the Alpine Office.

46.     Defendant Estrella P M LLC ("Estrella PM") is a Utah limited liability company with its principal place of business in Utah County, State of Utah, and with offices at the Alpine Office.

47.     Estrella Group, Estrella OK, and Estrella PM (collectively "**Estrella Entities**"), jointly and severally, and as part of an enterprise, have conspired with the other Defendants to defraud Brinton. Because the Defendants have actively concealed their inner workings, information regarding the exact nature and actions of each of the Estrella Entities are uniquely known to the Defendants and will be uncovered only through discovery and accountings. The Estrella Entities were used by the Defendants in their scheme to defraud Brinton through the mismanagement of Plaintiffs' real properties.

48.     Defendant Zurich Holdings Limited Liability Company ("**Zurich**") is a Utah limited liability company with its principal place of business in Utah County, State of Utah.

49.     Non-party[7] WCMF, Inc. ("**WCMF**") is corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Clark County, State of Nevada. WCMF is owned, on information and belief, by Conte and Enloe. At all relevant times, WCMF is or was the landlord of the Highland Oaks Property and the San Jacinto Property.

---

[7] See FN 2, *supra*.

50.     Non-party[8] Trophy Properties NV LLC ("*Trophy*") is a Nevada Limited Liability Company with its principal place of business in Clark County, State of Nevada. On information and belief, this entity was owned by Conte, who turned over management control, at least for some period of time, to Branden Hansen.

51.     Defendant Heathrow Holdings, LLC ("*Heathrow*") is a Texas Limited Liability Company with its principal place of business in Utah County, State of Utah.

52.     Defendant Flintshire Holdings, LLC ("*Flintshire*") is a Utah Limited Liability Company with its principal place of business in Utah County, State of Utah.

53.     Defendant Low Cost Rentals, LLC ("*Low Cost*") is a Utah Limited Liability Company with its principal place of business in Utah County, State of Utah.

54.      Defendant Junction Market VII, LLC ("*Junction VII*"), is a Utah limited liability company with its principal place of business in Utah County, State of Utah.

55.     Defendant Bank of the West ("*Bank*") is a corporation organized and existing under the laws of the State of California. Bank is registered to do business in Utah, operates substantial banking activities in the State of Utah, and employs Warwood and Peterson in a branch in the State of Utah. Warwood and Peterson performed the acts complained of in the course and scope of their duties as Manager and Assistant Manager, respectively, for Bank.

56.     Defendant Blue Fun Group, LLC ("*Blue Fun*") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. On information and belief, Blue Fun is owned and/or controlled by Hansen and Hanna, and participated in fraudulent transactions as alleged below.

57.     Courtside, Estrella Entities, Zurich, WCMF, Trophy, Heathrow, Flintshire, Low Cost, Bank, Junction VII, and Blue Fun (collectively "*Entity Defendants*"), and Bank (through Defendants Warwood and Peterson), jointly and severally, and as part of an

---

[8] See FN 2, *supra*. Plaintiffs understand this entity is owned by Conte. In the event this turns out to be false, Plaintiffs will amend their complaint to name Trophy as a defendant.

enterprise, have conspired with the other Defendants to defraud Brinton. The Entity Defendants are under the control of Conte, Hansen, and Branden Hansen. Because Defendants have actively concealed their inner workings, information regarding the exact nature and actions of each of the Entity Defendants is uniquely known to the Defendants and will be uncovered only through discovery and accountings. The Entity Defendants and Bank were used by Defendants in their scheme to defraud Plaintiffs through the mismanagement of Plaintiffs' real properties.

58.     Defendants John Doe 1 through 400 are entities and/or individuals whose identities or the full extent of their involvement are not yet known to the plaintiffs but whose actions caused injury to the plaintiffs. Plaintiff will seek leave to amend this complaint when the identity and involvement of these Doe defendants is ascertained.

## II.     JURISDICTION AND VENUE

59.     This Court has jurisdiction over this civil action because this action arises from federal question jurisdiction under 28 U.S.C. § 1331, and because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") 18 U.S.C. § 1961 *et seq.*

60.     To the extent any Defendant is not a citizen of Utah, or an entity domiciled in Utah, this Court has personal jurisdiction under 18 U.S.C. § 1965(b) because the ends of justice require that all Defendants be brought before this Court to answer for their fraud, and because each of these above-listed defendants has conspired and joined an enterprise with Utah-based defendants to intentionally commit fraud in the State of Utah against Plaintiffs that these defendants knew to be in Utah, and therefore each of these defendants has minimum contacts with the forum state of Utah. As to Munoz, Odenath, Grande, Manriquez, and Garcia, these defendants worked and conspired with Utah-based Defendants including Hansen, Branden Hansen, Munoz, and/or Turner to defraud Brinton in Utah. As to all Entity Defendants not domiciled in Utah, these entities are controlled by Utah-based persons and were used by Utah-based persons to defraud

Brinton in Utah. Bank has branches and regularly conducts business in the State of Utah, one of which is the branch where Warwood and Peterson are regularly employed.

61.     Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district and because a substantial part of the property that is the subject of the action is situated in this district.

62.     Venue is proper in this district under 18 U.S.C. § 1965 as well because Plaintiffs assert a RICO claim against Defendants and because Defendants have an agent, transact their affairs, or reside in this district.

63.     The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiffs' claims under Utah law against Defendants because Plaintiffs' claims are so related to the claims within the Court's original jurisdiction that they form a part of the same case or controversy under Article 3 of the United States Constitution.

## III.     CONDITIONS PRECEDENT

64.     All conditions precedent have been performed or have occurred.

## IV.     FACTUAL BACKGROUND

### A.     Overview of Real Property Transactions at Issue

65.     Defendants conspired to fraudulently induce Brinton into entering a series of real property transactions over the course of less than a year that have depleted Brinton's estate by tens of millions of dollars.

66.     On February 19, 2016, Hansen spoke to Brinton about the possibility of entering into a series of real property transactions involving properties owned (or previously owned) by Conte.[9] Several of these transactions would be subject to Section 1031 of the Internal Revenue Code, which allows an exchange of like-for-like real property without triggering capital gains tax. Eventually, Plaintiffs (1) entered into master leases with an option to purchase certain properties from Conte, (2) purchased certain other properties

---

[9] At the time, Hansen falsely stated some of these properties were owned by himself.

COMPLAINT

- 18 -

from Conte, Hansen, and/or Branden Hansen, and (3) sold certain other properties owned by Plaintiffs to Conte with a lease-back to Plaintiffs and an option to purchase from Conte.

67.     The real estate transactions at issue are: Dewey Transaction, Sierra Point Transaction, Southern Oaks Transaction, TMBRS Transaction, Manzana Transaction, Highland Oaks Transaction, Blue House Transaction, Island Park Station Transaction, Fairview Station Transaction, Alpine Station Transaction, Scipio Station Transaction, and Springdale Station Transaction (collectively "*Transactions*"). Each of the Transactions is defined as the transaction described in the subsection of Section IV.B below that bears its name.

###### B.     Defendants Made False Representations to Induce Brinton to Enter into the Transactions

68.     Hansen induced Brinton into entering into the Transactions by promising him on February 19, 2016, and repeatedly thereafter, that Plaintiffs' participation in these Transactions would lead to Plaintiffs having the opportunity to participate in a forthcoming real estate transaction ("*Forthcoming Real Estate Transaction*") involving financing to rehabilitate and stabilize these newly acquired properties which Plaintiffs could then sell to a new group or entity ("*Purported Buyer*"), which would purchase these properties for double their cost to Plaintiffs. Hansen stated this Forthcoming Real Estate Transaction was being assembled by Odenath, with assistance by Fairchild, and financing to rehabilitate and stabilize the properties was being provided by Halliday, and would also be participated in by Conte. Odenath, Halliday, Fairchild and Conte made representations in the following days to Brinton identical to those made by Hansen, that supported Hansen's statements about their involvement, and helped to convince Brinton to rely on the representations that these persons were setting up the Forthcoming Real Estate Transaction.

69.     Conte, Hansen, Turner, Branden Hansen, and Munoz further induced Brinton to enter into the initial Transactions by misrepresenting to Brinton in the same time frame:

(1) the net operating income ("**NOI**");[10] and (2) the capitalization rate ("**Cap Rate**"),[11] of the properties being sold to him. This is significant because in the real estate industry, the NOI divided by the Cap Rate determines the fair market value of a particular piece of property. In other words, there is an inverse relationship between Cap Rate and fair market value for any particular piece of property. Believing these representations, Plaintiffs unknowingly overpaid for these properties in the Transactions.

70.     Much of the financing for these Transactions was given by Conte. An honest, third-party financing source would have performed an appraisal and shared the results of the appraisal with Brinton, which would have notified him of the discrepancy. However, because he was part of the enterprise and conspiracy, Conte did not appraise these properties or share the results with Brinton.

71.     In a meeting at Hansen's office on March 17, 2016, Hansen stated that, in the Forthcoming Real Estate Transaction, Brinton would also be able to sell his newly acquired properties for double the amount he had paid. Hansen further represented that some of the properties in the Forthcoming Real Estate Transaction would be purchased from Plaintiffs at Cap Rates one fourth or less of the Cap Rate paid by Plaintiffs, because the Purported Buyer in the Forthcoming Real Estate Transaction would be willing to accept a lower annual return on the real properties they would purchase, thus paying Plaintiffs a greater purchase price for the properties than the price paid by Plaintiffs.

72.     Hansen made multiple follow-up misrepresentations to Brinton to induce him to enter the Transactions, including: a phone call with Brinton on February 19, 2016; an in-

_____

[10] NOI is the measure of annual income generated by a piece of income-producing property, calculated as total revenues, minus operating expenses. Operating expenses generally include reserves for maintenance, but exclude "non-operating" expenses such as depreciation, amortization, income taxes and interest or dividends.

[11] The Cap Rate is the rate of return demanded on a real estate investment property. It is calculated as the ratio of NOI divided by market price.

person meeting with Brinton and Tom Meyer at Hansen's office on March 17, 2016; an in-person meeting at Wayne Ross' house with Wayne Ross, Tom Meyer, and Brinton; and an in-person presentation to Brinton's family at Brinton's home on April 12, 2016. On each of thoese occasions, Hansen made misrepresentations to Brinton as to the value of the properties at issue to induce Brinton to enter into the Transactions. Conte also made misrepresentations on multiple occasions to Brinton as to the value of the properties, supporting Hansen's claims, including by forwarding a letter (via text message) dated August 30, 2016 from his residence in Las Vegas, Nevada.

73.     In or around September 2016, Hansen placed a telephone call from Utah, to Odenath in Florida, with Brinton, Bryan Brinton, Scott Brinton, and Tom Meyer participating. On that call, Odenath made the false representation that he was working with Hansen on putting together the Forthcoming Real Estate Transaction and that he had extensive experience putting together real estate transactions of this type. Odenath stated he specifically apportioned $750,000,000 of a $1,000,000,000 fund to purchase properties from Plaintiffs. Odenath made these representations knowing that they were false or with a reckless disregard for their truthfulness, in order to induce Brinton to enter into the Transactions.

74.     In or around February or March of 2017, Brinton met with Halliday at Halliday's office in Salt Lake City, Utah. At this meeting, Defendant Halliday made the false representation that he planned to fund the rehabilitation and stabilization portion of the Forthcoming Real Estate Transaction for at least $100 million, with $30 million committed to properties identified and either owned or leased by Plaintiffs, through a non-profit which Plaintiffs later learned had lost its charter and did not exist. In the weeks following, Defendant Halliday continued to make the false representation that funding for the properties to be involved in the Forthcoming Real Estate Transaction was imminent. As Brinton later discovered, the funding never came as the proposed funding entity, a

corporation of which Halliday was an officer and director, was defunct. Defendant Halliday made these representations knowing they were false or with a reckless disregard for their truthfulness, in order to induce Brinton to enter into the Transactions.

75.    In this same time frame, Conte and Hansen also made misrepresentations to Brinton that at least one of them owned all the properties leased to Plaintiffs with an option to purchase. During the pendency of these leases, Defendants lost some properties to foreclosure. They continued to accept lease payments after the foreclosures and did not notify Plaintiffs that their rights under the leases might be affected by the foreclosures.

### C.    Conte and Branden Hansen Engaged in a Pattern of Tax Evasion in the Sale of Each of the Properties at Issue.

76.    During the course of the Transactions, Conte engaged in a pattern of tax evasion by first transferring his interest in the entities that hold the deed(s) to the property(ies) at issue to Hansen's brother, Branden Hansen, or an entity owned or controlled by Branden Hansen, for a substantially lower amount than what the property would ultimately be sold for to Plaintiffs, thereby incurring only a small or negative capital gains tax to Conte. At the time of the transfer from Conte to Branden Hansen, the Defendants were aware of the price Plaintiffs planned to pay. Branden Hansen or an entity owned by him would then sell the property to Plaintiffs at the agreed price, and Branden Hansen would have a substantial tax liability. Often times the phantom transaction between Conte and Branden Hansen would happen after the fact and be pre-dated back in time to meet tax evasion needs of Conte. Conte would "finance" the final transaction—however, he paid no money to Branden Hansen, or to anyone—ultimately entering the vast majority of his profits in his financial records and bank accounts as an untaxed loan. Branden Hansen lacks the ability to pay the IRS for these false gains that do not truly belong to him and will be forced to settle the liability for something less, thus evading tax liability for the group of Defendants.

**D.    Conte, Hansen, Garcia, Grande, Manriquez, Munoz, Branden Hansen, Turner and Quayle Conspired to Purposefully Mismanage the Properties and Deplete the Property Income and Assets So as To Bring Plaintiffs into Default on Leases and Mortgages.**

77.    As part of the Transactions whereby Plaintiffs exchanged for or sold and leased back property, Conte and Hansen required[12] that Plaintiffs continue to use the same property managers that Conte and Hansen had used – Garcia, Grande, Manriquez, Munoz, Turner, Branden Hansen, and Quayle. These managers were loyal to Conte and Hansen, however, and they diverted income from the properties to Defendants, rather than using it for payment of the leases and mortgages, so as to cause Plaintiffs to default on their commitments. These defaults permitted and continue to permit Conte (and entities he controls) to evict or foreclose Plaintiffs. In addition, as to sale-leaseback property, the defaults engineered by the Defendants purportedly disqualify Plaintiffs from exercising options to purchase the leased property, and result in losing lease option deposits. As a result of this scheme, Conte obtained some of Plaintiffs' property by exchange, and then seeks to get the exchanged or leased property back from Plaintiffs as well through foreclosure, eviction, or cancellation of purchase options due to default. If allowed to complete the process, Conte will own all of Plaintiffs' property, plus his own property he gave up in exchange.

78.    Conte, Hansen, Garcia, Grande, Manriquez, Branden Hansen, Turner, Munoz, and Quayle had a meeting of the minds that this was their objective, and they used the unlawful means of embezzlement and theft of property income and assets under management to obtain it.

79.    On May 30, 2017, the Plaintiff entities, which are owned, controlled, or managed by Brinton, filed suit against Hansen in Utah state court and soon thereafter terminated all workers at the gas stations and convenience stores where Hansen and his subordinates Branden Hansen and Quayle, had been diverting funds. Hansen instructed Branden

---

[12] This was an after-the-sale condition placed by Conte and Hansen on their continued cooperation with the Forthcoming Real Estate Transaction.

COMPLAINT

Hansen, Quayle, and the other workers not to leave their positions so that they could continue to divert property income and assets to Defendants' ends.

E.  **The Specific Property Transactions at Issue**

1. **Dewey Transaction**

80.  On June 22, 2016, the "***Dewey Transaction***" closed whereby, Winchester purchased and received 100% of the membership interest in Dewey from Branden Hansen, who had received it immediately prior from Conte. Dewey purchased the Dewey Properties and paid for them with $766,603.76 of funds available through a 1031 exchange for the Winchester Property, plus a loan in the amount of $2.15 million from Conte.

81.  In April or May of 2016, Hansen toured Brinton by the Dewey Properties. During that trip, he offered to sell them for $2.9 million. This was a price in excess of the market comparables, but Hansen explained that these properties were more valuable because they had greater NOI than comparable properties. Hansen explained this was due to their having favorable section 8 housing tenants obtained through Conte's contacts with the town government. He further stated that amounts paid over otherwise market rates were necessary to enable Plaintiffs to participate in the Forthcoming Real Estate Transaction, described by Hansen as "pay to play." Hansen told Brinton this while they were in the car driving in or around Rochester with Tom Meyer, Bryan Brinton, Wayne Ross, Munoz, and Mark Jensen in the car. Hansen made identical or similar statements throughout April, May, and June, during meetings in the State of Utah.

82.  In or around the middle of June 2016 and prior to closing the Dewey Transaction, Conte told Brinton the Dewey Properties were together worth $2.9 million. This conversation took place on a phone call from Conte in Las Vegas, Nevada to Brinton in Utah.

83.     Each of these statements as to these properties was false. The person making each statement knew they were false or made the statement with a reckless disregard to the statement's truthfulness. A comparable property valuation done by Carolyn Stiffler shows these properties were worth only $1.7 million at the time of the Dewey Transaction, and the NOI/Section 8 explanation given by Hansen was false. These statements were made to induce Brinton to enter into the Dewey Transaction.

84.     To further induce Brinton to enter into this transaction, and to overcome any concerns about the valuation, Hansen also stated that purchasing the Dewey Properties at his and Conte's valuation was a condition of Brinton's participating in the Forthcoming Real Estate Transaction. Hansen told Brinton that the Forthcoming Real Estate Transaction was being assembled by Odenath, assisted by Fairchild, and that it would at least double Brinton's money. Hansen made this statement to Brinton in April or May of 2016 while driving in a car in or around Rochester. Wayne Ross, Tom Meyer, Munoz, Bryan Brinton, and Mark Jensen were also in the car at the time this statement was made.

85.     By inflating the value of the Dewey Properties, the Defendants intended to obtain more funds from Plaintiffs than they would have in a fair market value exchange. Additionally, they intended to inflate the amount of mortgage financing Plaintiffs would need from Conte, which would make it easier for Defendants to mismanage the property and divert income so as to cause a foreclosure.

86.     Plaintiffs entered into the Dewey Transaction in reliance on each of the above false statements, and paid $2.9 million for the Dewey Properties, most of which amount was financed by Conte. If Brinton had known that any one of the above statements were false, Plaintiffs would not have entered into the agreement to purchase the Dewey Properties.

87.     Conte strongly encouraged Brinton and Dewey to continue to use the same management personnel, including manager Grande, who Conte had used. In or around late June 2016, Conte further represented to Brinton via telephone call he made from Las

COMPLAINT
- 25 -

Vegas, Nevada, to Utah that Grande had integrity and was a good manager. Conte knew this was false, and instead insisted on using Grande as a manager because he was loyal to Conte and owed money to Conte. In reliance on this representation, Brinton signed an agreement employing Grande and increasing Grande's pay.

88.    When Dewey took possession of the Dewey Properties and retained Grande as manager, Grande assisted Conte, Hansen, Tuner, Munoz, and Branden Hansen in diverting property income and assets from Brinton and Dewey, including by purchasing materials and supplies with Plaintiffs' money and by using Plaintiffs' workers to perform work on Conte's and Grande's properties. Because of this diversion of assets, Brinton and Dewey were eventually unable to make the monthly mortgage payment to Conte. On information and belief, Conte will soon declare the property to be in default and start the process of seeking foreclosure so that the Dewey Properties will return to his ownership. Conte and Grande had a meeting of the minds that Grande would divert assets from this property, which would allow Conte to foreclose on and regain ownership of the Dewey Properties.

89.    After Brinton became more involved in the management of the Dewey Properties, he noticed irregularities in Grande's work and financial reporting and Dewey fired him for dishonesty. Conte became involved and insisted that Dewey pay a substantial severance, or Plaintiffs would risk not receiving promised financing from Conte. Subsequently, Hansen, Branden Hansen and Munoz re-hired Grande, who continued to mismanage and embezzle funds from Dewey.

### 2.    Sierra Point Transaction

90.    On or about August 1, 2016, ZibalStar entered into a lease with option to purchase the Sierra Point Property from 1433 OK, an entity at the time controlled by Conte. ZibalStar subsequently assigned the lease to Brighton.

91.     On or about August 25, 2016, Brighton exercised the option to purchase the Sierra Point Property. This was accomplished by exchanging the Seven Peaks Provo Property in Provo, Utah to 1433 OK, for the Sierra Point Property in Tulsa, Oklahoma. 1433 OK transferred the Seven Peaks Provo Property to Conte, who leased it back to Seven Peaks Provo.

92.     At the time, Sierra Point Property and the Seven Peaks Provo Property each had mortgages to third parties in excess of $7 million, which obligations were also exchanged. As the tenant, Seven Peaks Provo was to pay the underlying mortgages directly, and a lease payment on top of that.

93.     On or about February 19, 2016, Hansen told Brinton that the Sierra Point Property was worth $23 million. This conversation took place over the phone. From this time forward, Hansen multiple times made this representation as to the value of the Sierra Point Property, and never varied from it. On April 4, 2016, in a meeting at Wayne Ross' house with Brinton, Wayne Ross, and Tom Meyer, Hansen reaffirmed the value to be in excess of $23 million. Again, on April 12, 2016 in a meeting with Brinton's family at Brinton's home, Hansen boasted of the size and value of the property and that this single property with 348 doors, valued in excess of $23 million, would be a substantial step in qualifying for the Forthcoming Real Estate Transaction.

94.     Prior to the Sierra Point Transaction, Conte and Brinton negotiated a master lease with option to purchase on the Sierra Pointe Property. On or about July 2016, during this process, Conte told Brinton, on a phone call to him from Las Vegas, Nevada to Utah, and in email communications also from Las Vegas, Nevada to Utah, that the Sierra Point Property was worth in excess of $18.5 million.

95.     Each of these statements as to these properties was false. The person making each statement knew it was false or made the statement with a reckless disregard to the statement's truthfulness. A valuation done by White Glass Lending shows that the Sierra

property was in fact worth only $12 million at the time of the Sierra Point Transaction. These statements were made to induce Brinton to enter into the Sierra Point Transaction.

96.     In addition, on April 21, 2017, Raymond Lord, a real estate professional in the Oklahoma market, told Mark Jensen and Brinton that he, Raymond Lord, had informed Conte that Sierra Point was worth only $12 million just prior to Conte selling Sierra to Brighton in an exchange at a valuation much higher than $12 million.

97.     To induce Brinton to enter into the Sierra Point Transaction, Hansen also insinuated to Brinton that purchasing the Sierra Point Property at his and Conte's valuation would make it a large enough property that it would allow Brinton to "play with the big boys" and would solidify Brinton's ability to participate in the Forthcoming Real Estate Transaction. On or about February 19, 2016, and March 9, 2016, in a telephone conversation associated with the Sierra Point Transaction, Hansen stated that Brinton could purchase one or two properties through Hansen, or he could "get serious about getting to 10,000 doors" to be able to participate in the Forthcoming Real Estate Transaction that others were already taking advantage of. He told Brinton that the Forthcoming Real Estate Transaction was being assembled by Odenath, with the assistance of Fairchild, and that it would double Brinton's money.

98.     Brinton relied on each of the above false statements by exchanging the Seven Peaks Provo Property, which has a value of $18.9 million in an appraisal by Cushman & Wakefield as of January 7, 2016, and which his family has owned and operated for eighteen years, for the Sierra Point Property. As part of the transaction, Plaintiff Seven Peaks Provo entered into a lease agreement to continue operating Seven Peaks Waterpark, Provo, with an option to buy the Seven Peaks Provo Property back once the Forthcoming Real Estate Transaction had taken place. Brinton believed that, with the proceeds from the Forthcoming Real Estate Transaction, he could repurchase the Seven

Peaks Provo Property. If Brinton had known that any one of the above statements were false, he and his entities would not have entered into this transaction.

99.     As part of this transaction, Conte strongly encouraged Brinton to continue to use the same management personnel for Sierra, including Manriquez as manager, that Conte had used. In or around July 2016, Defendant Conte further represented to Brinton via telephone, again from Las Vegas to Utah, that Manriquez was a competent property manager who could be trusted. Conte also later threatened in a text message sent from Las Vegas to Brinton in Utah in November 2016, "[i]f you want my cooperation, you need to let Eric [Manriquez] run the properties properly in the manner I would expect them to be run." In reliance on these statements, Brinton continued to use Manriquez's services to manage the Sierra Point Property.

100.    Since the time ZibalStar began leasing the Sierra Point Property, and continuing through May 30, 2017, Manriquez diverted income and assets from the Sierra Point Property to himself and Defendants, with Munoz's and Hansen's knowledge and acquiescence as his supervisors. This included Manriquez instructing the laundry company to send proceeds of the on-site laundry facility to Manriquez himself. Manriquez also referred potential Sierra Point Property tenants to other properties Conte and Manriquez had interests in. He also used building materials, tools, and workers of Brighton, at Brinton's and Brighton's expense, to make improvements on and maintain Conte's and Manriquez's properties. Because of this diversion of assets and mismanagement, Brinton was unable to make the monthly mortgage payments on the Sierra Point Property. Conte and Manriquez had a meeting of the minds that Manriquez would divert assets from the Sierra Point Property, which would allow Conte to re-purchase the Sierra property in a foreclosure sale and regain ownership of other properties, including the Seven Peaks Provo Property.

101.    In May 2017, Brinton terminated Defendants, including Manriquez, Munoz, Turner, and Hansen and their agents, as property managers for Sierra Point; however, Defendants returned to the property, including breaking into storage sheds and stealing equipment that was stored therein, unsuccessfully attempting to break into other storage sheds, and breaking into a storage area by breaking a window and then spreading paint around and damaging and destroying laundry machines.

102.    As the summer season approached, Hansen also began inserting himself in a managing role at the Seven Peaks Provo Property. After inserting himself in the management of Seven Peaks Provo Property, Hansen began making extravagant unnecessary purchases, and diverting property income and assets from Seven Peaks Provo, including by negotiating kickbacks with the food and the beverage purveyors and falsely representing that he was an owner of Seven Peaks Provo. Hansen falsely told Brinton that he had paid Conte for the lease payments on the Seven Peaks Provo Property. Hansen did this to set Brinton up for an eviction or other action by Conte after Brinton had gotten the parks up and operational for the summer season.

103.    In his inserted role in management of the Seven Peaks Provo Property, Hansen failed to make the lease payments to Conte, which Hansen was tasked with making and stated that he was making; or, in the alternative, Hansen colluded with Conte to apply payments to other obligations so as to leave the lease on the Seven Peaks Provo Property in default. The purpose was to take Brinton's prized asset (the Seven Peaks Provo Property) from his family. This diversion of assets and income and lies about making the lease payments has caused Seven Peaks Provo to miss making its lease payments. Conte has since declared Plaintiff Seven Peaks Provo to be in default under the lease on the Seven Peaks Provo Property, and (subsequently to this action being filed) has made efforts to evict Seven Peaks Provo.

### 3.     East Main Transaction

104.    On or about October 2, 2016, an entity owned and controlled by Brinton's family sold Courtside to Conte. Courtside owned (and still owns) the Courtside Property, which were leased back by ZibalStar. Proceeds from the sale were placed with a 1031 Exchange facilitator.

105.    On or about November 3, 2016, Plaintiffs utilized funds from the Courtside Property exchange to put $25,000 down on the East Main Property. The balance of $356,000 was financed through a mortgage to Conte. The East Main Property was placed in a new entity, East Main.

106.    On October 27, 2016, Conte signed a Master Funding Agreement with Plaintiffs, promising to finance renovations and rehabilitation of properties purchased by Plaintiffs. This agreement covered the East Main Property.

107.    Despite demand, Conte failed and refused to fund the rehabilitation of the East Main Property, which damaged East Main as this entity has been unable to date to finance rehabilitation which has made it unable to obtain tenants and pay the mortgage to Conte. East Main would never have purchased the East Main Property if Conte had not promised to finance renovations, but acted in reliance on the Master Funding Agreement.

### 4.     Southern Oaks Transaction

108.    As alleged above in connection with the Dewey Transaction, Winchester had sold the Winchester Business Park and had funds available for a 1031 exchange.

109.    Winchester purchased the Southern Oaks apartment complex, located in Oklahoma City, Oklahoma ("*Southern Oaks Property*") by acquiring from Star Re, LLC ("*Star Re*"), all the membership interests of Derbyshire, which fully owned the Southern Oaks Property.

110.    As part of the Southern Oaks Transaction, Winchester wired $220,000 to Defendant Hansen to use as a down payment to Star Re, LLC. At the time, Star Re was owned by Mark Beesley. However, Defendant Hansen did not transmit these funds to

Star Re, and instead kept them for himself. To complete this transaction, Winchester had to obligate itself to pay this amount again directly to Star Re and/or Mark Beesley.

111.    To induce Brinton to enter into the Southern Oaks Transaction, Hansen also stated to Brinton that purchasing the Southern Oaks Property would help qualify Brinton for participating in the Forthcoming Real Estate Transaction because it was the type of property that could be used in that transaction. This statement was made on or about April 4, 2016, at Wayne Ross' house. Wayne Ross was also present when this statement was made. Hansen told Brinton that the Forthcoming Real Estate Transaction was being assembled by Odenath, with the assistance of Fairchild, and that it would double Brinton's money. Hansen made this statement to Brinton in April or May 2016 while driving in a car in or around Rochester. Wayne Ross, Tom Meyer, Munoz, Bryan Brinton, and Mark Jensen were also in the car at the time this statement was made.

### 5.    TMBRS Transaction

112.    On or around September 13, 2016, Brinton purchased a 20% membership interest in TMBRS from Mark Beesley for $557,000. Brinton also acquired 51% of the voting rights of TMBRS in this transaction.

113.    At the time, TMBRS was the lessee of the TMBRS Properties. Each of these leases also had an option to purchase the subject property at a price lower than the stated fair market value.

114.    After the purchase of TMBRS, Conte approached Brinton and stated that TMBRS had not made capital improvements to the properties that Conte demanded be made. Conte agreed to advance funds to make capital improvements at the TMBRS Properties. Manriquez scheduled and ordered work performed prior to these advances, and when the bills came in Conte refused to pay them. TMBRS and ultimately Brinton was forced to pay these bills for improvements to Conte's property, and thereby suffered damage.

115.     Conte again required that Manriquez remain the manager in charge of the six TMBRS Properties in Tulsa, Oklahoma.[13] In or around July 2016, Conte further represented to Brinton via telephone call from Las Vegas, Nevada to Utah that Manriquez was a competent property manager who could be trusted. In November 2016, Conte sent a text message to Brinton stating, "[i]f you want my cooperation, you need to let Eric [Manriquez] run the properties properly in the same manner I would expect them to be run." In reliance on these statements, Brinton continued to use Manriquez's services to manage the TMBRS Properties.

116.     As property managers of the TMBRS Properties, Manriquez, under the supervision of Munoz and Hansen and with the cooperation of Turner, diverted income and assets from TMBRS to themselves and the Defendants. Because of this diversion of assets, TMBRS was unable to make the monthly lease payments due to Conte on these properties. Conte, Manriquez, Hansen, Turner and Munoz had a meeting of the minds that Manriquez would divert assets from these properties, which would allow Conte to declare the leases in default, declare the option-to-purchase void, and regain ownership of them.

117.     In May 2017, Brinton terminated Defendants, including Manriquez, Munoz, Turner, and Hansen and their agents, as property managers; however, Defendants returned to the properties, including entering an upstairs office at the Cove Property and stealing computer equipment and files stored therein.

### 6.     Manzana Transaction

118.     On or around August 1, 2016, ZibalStar entered into a lease agreement with Conte for the Manzana Grove Property in Fort Worth, Texas. The lease agreement included an option to purchase the property for $12 million. The consideration for the option was a lien for $1 million placed on the Seven Peaks Porter Property owned by White Stallion.

---

[13] The Four Oaks Property, the Silverwood Property, the Whispering Oaks Property, the McKinley Property, the Cove Property, and the Bradford Property.

COMPLAINT

119.    On or around February 19, 2016, Hansen told Brinton that the Manzana Grove Property was worth $18.5 million to persuade Brinton into participating in this transaction. This statement was made over the phone. This statement was false and substantially overstated the value of the property. The person making the statement knew it was false or made the statement with a reckless disregard to the statement's truthfulness.

120.    In July 2016, Conte told Brinton that he had listed the Manzana Grove Property in 2011 for $18 million and that he would only charge Brinton $500,000 more because of an increase in rents and other improvements to the property. This statement as to this property was false and substantially overstated the value of the property. The person making the statement knew it was false or made the statement with a reckless disregard to the statement's truthfulness. This statement was made to induce Brinton to proceed with the Manzana Transaction.

121.    To induce Brinton to enter into this transaction, Hansen also stated that leasing and eventually purchasing the Manzana Grove Property would increase Brinton's chances of participating in the Forthcoming Real Estate Transaction. On March 9, 2016, in a conversation about the Manzana Transaction, Hansen stated that Brinton could participate in the Forthcoming Real Estate Transaction if he wanted but that others were already taking advantage of the opportunity. He told Brinton that the Forthcoming Real Estate Transaction was being assembled by Odenath, with assistance by Fairchild, and that it would double Brinton's money.

122.    Additionally, the represented $6.5 million difference between the option price and the asserted market value of $18.5 million in this transaction was made as an inducement to Brinton to participate in the other Transactions. However, this inducement was false, because the Manzana Grove Property is worth, on information and belief, approximately

$12 million. Thus, this valuable "bonus" for participating in the Transactions was just an offer to purchase at market price.

123.    Brinton relied on each of the above false statements by agreeing to lease the Manzana Grove Property, to allow a lien on the Seven Peaks Porter Property owned by White Stallion, and to participate in other Transactions. If Brinton had known that any one of the above statements were false, he would not have entered into the Manzana Transaction.

### 7.    Highland Oaks Transaction

124.    On or around August 1, 2016, ZibalStar entered into a lease agreement with Conte as to the Highland Oaks Property. The lease agreement included an option to purchase the property for $8.5 million. The consideration for the option was a lien for $1 million placed on the Seven Peaks Porter Property owned by White Stallion.

125.    On or around February 19, 2016, Hansen told Brinton that the Highland Oaks Property was worth $12 million to persuade Brinton to participate in this transaction. This statement was made over the phone.

126.    To induce Brinton to enter into this transaction, Hansen also stated that leasing and eventually purchasing the Highland Oaks Property would increase Brinton's chances of participating in the Forthcoming Real Estate Transaction. On or around February 9, 2016, and March 9, 2016, in a telephone conversation about the Highland Oaks Transaction, Hansen stated that Brinton could participate in the Forthcoming Real Estate Transaction if he wanted but that others were already taking advantage of the opportunity. He told Brinton that the Forthcoming Real Estate Transaction was being assembled by Odenath, with the assistance of Fairchild, and that it would double Brinton's money.

COMPLAINT

- 35 -

127.    Additionally, the represented $3.5 million difference between the option price and the asserted market value of $12 million in this transaction was made as an inducement to participate in the other Transactions.

128.    These statements were false. They substantially overstated the value of the property, and the Forthcoming Real Estate Transaction was a fiction. The person making the statements knew they were false or made the statements with a reckless disregard to their truthfulness. The Highland Oaks Property is worth, on information and belief, approximately $6.75 million. Thus, this valuable "bonus" for participating in the Transactions is actually an offer to purchase at above market price.

129.    Brinton relied on each of the above false statements by agreeing to lease the Highland Oaks Property from Defendant Conte, to allow a lien on the Seven Peaks Porter Property owned by White Stallion, and to participate in the other Transactions. If Brinton had known that any one of the above statements were false, he would not have entered into this agreement.

130.    Conte strongly encouraged Brinton to continue to use the same management personnel for Highland Oaks, including manager Garcia, that Conte had used. Conte insisted to Brinton that if he did not use Garcia, he would fall out of favor on the Forthcoming Real Estate Transaction. In mid-July 2016, Conte further represented to Brinton via a telephone call from Las Vegas, Nevada to Utah that Garcia was honest, was a pastor, and could be trusted. In reliance on these statements, Brinton continued to use Garcia's services to manage the Highland Oaks Property. Conte knew these statements were false, and that Garcia intended to use his position to the benefit of Conte and detriment of Brinton.

131.    As property manager for ZibalStar, Garcia diverted income and assets from ZibalStar. Garcia would instruct ZibalStar's workers to work at Garcia's church academy and personal residence and bill their time to ZibalStar. When Inocencio was promoted to

oversee Garcia's work, Conte, Hansen, Munoz and Garcia agreed to not allow her to have any communication with Garcia or even be on the same management messaging system. They justified this measure to Brinton by stating that Garcia's wife, Emma, was "uncomfortable" with Inocencio working with Garcia. The geographic distance between Inocencio and Garcia, combined with the absolute communication disconnect between Garcia and his supervisor allowed Garcia to secretly divert assets. In addition, Garcia, Munoz, and Hansen cooperated to divert laundry income to Hansen. Because of these diversions of assets, ZibalStar was unable to make the monthly lease payments due to Conte.

132. Conte, Hansen, Munoz, and Garcia had a meeting of the minds that Garcia would embezzle and divert assets from this property to Defendants, which would cause the lease to go unpaid and allow Conte to declare the lease to be in default and evict and/or void the option-to-purchase.

### 8. Blue House (Fillmore) Transaction

133. On or around October 5, 2016, Blue House acquired from Branden Hansen the Blue House Property, consisting of the real estate and business known as the Fillmore Hotel in Fillmore Utah for $720,000 of the proceeds from the Courtside Property 1031 exchange.

134. In or around September or October 2016, but prior to the transaction, Hansen told Brinton that this property was worth $720,000.00 to persuade Brinton to participate in this transaction. Hansen told Brinton this during purchase negotiations while in Hansen's office. Bryan Brinton, Scott Brinton, Tom Meyer, and Branden Hansen were present.

135. This statement was false. The person making the statement knew it was false or made the statement with a reckless disregard to the statement's truthfulness. Hansen later told Scott Brinton on May 4, 2017, via telephone, that the property was actually worth only $550,000.00. Blue House ultimately sold this property for $130,000.

136.    Brinton relied on this false statement, agreeing to purchase this property for $720,000.00. If Brinton had known that any one of the above statements were false, he would not have entered into this agreement.

137.    Hansen persuaded Brinton to continue to allow him to manage this property by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing properties and that he was "an honest guy." These statements were false. In reliance on this representation, Brinton allowed Hansen to manage this property.

138.    Shortly after Blue House acquired this property, Hansen installed Quayle as the manager, and Hansen, Quayle, and Hanna began diverting property income and assets from Blue House. As of this date, no single deposit has been made into the account designated by Blue House for proceeds. All proceeds have been retained by Hansen, Quayle, and Hanna.

139.    On information and belief, Hanna arranged for all credit card receipts of Blue House to be directly deposited in an account in his name, under his control, and used for his personal purposes.

140.    Blue House has been damaged in that it has not received its rightful proceeds, and as a consequence, Plaintiffs have not been able to use these proceeds to make the monthly mortgage and lease payments to Conte on the assets listed in this complaint.

### 9.    Island Park Station Transaction

141.    In or around October or November 2016, Junction Island Park acquired a gas station and convenience store (operation and real estate) in Island Park Idaho ("*Island Park Station*") from Perry. This property was purchased with $49,113.06 cash from the Courtside Property 1031 exchange, and a $722,534.24 loan from seller, for a total of $762,534.24 plus approximately $9,000 of closing costs.

COMPLAINT

142.   In or around October or November, but prior to the transaction, Hansen told Brinton that this property was worth $762,000.00 to persuade Brinton to participate in this transaction. This statement was made during purchase negotiations at Hansen's office with Bryan Brinton, Scott Brinton, Tom Meyer, Munoz, David Turner, and Branden Hansen present.

143.   To the extent Brinton was skeptical of the $762,000 valuation, Hansen indicated that this price was necessary to help him resolve personal obligations to the seller, it would allow Brinton to remain qualified for the fictitious Forthcoming Real Estate Transaction, and that Perry would fund future transactions if Plaintiffs treated him well on this transaction.

144.   These statements were false. The Hansen knew they were false or made the statements with a reckless disregard to their truthfulness.

145.   Brinton relied on this false statement and agreed to purchase this property for approximately $762,000.00. If Brinton had known that the above statements were false, he would not have entered into this agreement.

146.   Hansen persuaded Brinton to allow him to manage the Island Park Station by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing gas stations/convenience stores, and that he was "an honest guy." These statements were knowingly false. In reliance on this representation, Brinton allowed Hansen to manage this property, with the help of Branden Hansen and Quayle.

147.   As managers of the Island Park Station, Hansen, Branden Hansen, Quayle and Turner, diverted income and assets from Junction Island Park. Quayle, an employee of Hansen and Branden Hansen, oversaw the management of this gas station and these four conspired to divert funds and assets. Quayle and Branden Hansen allowed associates of Hansen to pump free gas in exchange for favors to Hansen. Hansen, Quayle, Branden Hansen, and Turner never made a single deposit of cash proceeds into the bank accounts

COMPLAINT

set up by Junction Island Park to receive proceeds. Instead, all proceeds have been deposited in Branden Hansen's account. When pressed on the issue of the deposits, Defendants replied that it was simply "off season." On information and belief, Quayle, Hansen, Turner, and Branden Hansen appropriated this cash income to their personal uses and/or for the Defendants. Because of these diversions of assets, Junction Island Park was unable to make the monthly mortgage payments to Perry, who then sought to foreclose on this property.

### 10.   Fairview Station Transaction

148.    On or around November 30, 2016, Junction Fairview acquired a gas station and convenience store (operation and real estate) in Fairview, Utah ("***Fairview Station***") from Junction VII. This property was purchased with $352,324.58 cash from the Courtside Property 1031 exchange, and assumption of existing mortgages and liens in the amount of $513,700.81.

149.    In or around October or November 2016, but prior to the transaction, Hansen, told Brinton that this property was worth $865,000.00 to persuade Brinton into participating in the Fairview Station Transaction. Hansen told Brinton this during purchase negotiations at Hansen's office with Bryan Brinton, Scott Brinton, Tom Meyer, Munoz, David Turner, and Branden Hansen present.

150.    This statement was false. The person making the statement knew it was false or made the statement with a reckless disregard to the statement's truthfulness. A broker's price opinion has valuated this property at $600,000.00 at the time of the Fairview Station Transaction.

151.    Brinton relied on this false statement and agreed to purchase this property for $865,000.00. If Brinton had known that the above statement was false, he would not have entered into this agreement.

152.    Hansen persuaded Brinton to allow him to manage this property by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing gas stations/convenience stores, and that he was "an honest guy." These statements were false. In reliance on this representation, Brinton allowed Hansen to manage this property, with the help of Branden Hansen and Quayle.

153.    As managers of the Fairview Station, Hansen, Branden Hansen, Quayle and Turner diverted income and assets from Junction Fairview. Defendant Quayle, an employee of Defendant Hansen and Branden Hansen, oversaw the management of this gas station and these four conspired to divert funds and assets. Quayle and Branden Hansen allowed associates of Hansen to pump free gas in exchange for favors to Hansen. Quayle, Hansen, Turner, and Branden Hansen also failed to ensure all of the cash proceeds were deposited into the bank accounts set up by Junction Fairview. On information and belief, Quayle, Hansen, Turner and Branden Hansen appropriated this cash income to their personal uses and/or for the Defendants.

154.    In May 2017, Brinton terminated Hansen and his underlings as property managers; however, Hansen and his underlings, including Quayle and Branden Hansen, refused to leave the property, and continued to sell inventory owned by Brinton and to divert and deplete this station's assets and income. When an order of restitution was issued by a Utah District Court, Defendants pillaged the property, removing assets or selling them at fire-sale prices.

### 11.    Alpine Station Transaction

155.    On or around March 15, 2017, Junction Alpine acquired a gas station and convenience store (operation and real estate) in Alpine, Utah ("*Alpine Station*"), from Trophy. This property was purchased with $200,000 cash from the Courtside Property 1031 exchange, and $1.7 million of financing provided by Trophy secured by a mortgage.

156.    On or around March 15, 2016, but prior to the transaction, Hansen told Brinton that this property was worth $1.9 million to persuade Brinton to participate in the Alpine Station Transaction. Hansen told Brinton this during purchase negotiations at Hansen's office with Bryan Brinton, Scott Brinton, Tom Meyer, Munoz, David Turner, and Branden Hansen present.

157.    Prior to this purchase, Conte met with Brinton, and asked him to purchase the Alpine Station. In return, Conte promised to further assist Brinton to participate in the Forthcoming Real Estate Transaction.

158.    To the extent Brinton was skeptical of the $1.9 million valuation, Conte stated that this price was necessary to retain his cooperation in real estate deals, particularly concerning TMBRS Properties, and remain qualified for the (fictitious) Forthcoming Real Estate Transaction.

159.    These statements were false. The people making them knew they were false or made the statements with a reckless disregard to their truthfulness. A broker's price opinion has valuated this property at $650,000.00 at the time of the Alpine Station Transaction.

160.    Brinton relied on these false statements and agreed to purchase this property for $1.9 million. If Brinton had known that the above statements were false, he would not have entered into this agreement.

161.    Hansen persuaded Brinton to allow him to manage this property by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing properties, particularly gas stations/convenience stores, and that he was "an honest guy." These statements were false. In reliance on this representation, Brinton allowed Hansen to manage this property, with the help of Branden Hansen and Quayle.

162.    As managers of the Alpine Station, Hansen, Branden Hansen, Quayle, and Turner diverted income and assets from Junction Alpine. Quayle, an employee of Hansen and Branden Hansen, oversaw the management of this gas station and these four conspired to divert funds and assets. Quayle and Branden Hansen allowed associates of Hansen to pump free gas in exchange for favors to Hansen. Hansen, Quayle, Branden Hansen, and Turner also failed to ensure all of the cash proceeds were deposited into the bank accounts set up by Junction Alpine. When pressed on the issue of there being little or no cash income deposits, Quayle replied that it was simply "off season." On information and belief, Hansen, Quayle, Branden Hansen, and Turner appropriated this cash income to their personal uses and/or for the Defendants. As manager, Hansen, Branden Hansen, Quayle, and Turner were tasked with making the monthly mortgage payment to Trophy. Because of these diversions of income and assets, there were insufficient funds available to make these payments, and these Defendants did not notify Plaintiffs of the shortfall. Trophy has declared Junction Alpine to be in default and, on information and belief, has initiated the foreclosure process.

163.    In May 2017, Brinton terminated Hansen and his underlings as property managers; however, Hansen and his underlings, including Defendants Branden Hansen and Quayle, have refused to leave the property, and continue to sell inventory owned by Junction Alpine and to divert and deplete this station's income and assets.

### 12.    Scipio Station Transaction

164.    On or around March 15, 2017, Junction Scipio acquired a gas station and convenience store (operation and real estate) in Scipio, Utah ("***Scipio Station***"), from Trophy. This property was purchased with $142,331.06 cash from the Courtside Property 1031 exchange, and $1.1 million of financing provided by Trophy secured by a mortgage.

165.    On or around March 15, 2016, but prior to the transaction, Hansen told Brinton that this property was worth $1.24 million to persuade Brinton into participating in the

Scipio Station Transaction. Hansen told Brinton this during purchase negotiations at Hansen's office with Bryan Brinton, Scott Brinton, Tom Meyer, Munoz, David Turner, and Branden Hansen present.

166.   Prior to this purchase, Conte met with Brinton, and asked him to purchase the Scipio Station. In return, Conte promised to further assist Brinton to participate in the Forthcoming Real Estate Transaction.

167.   To the extent Brinton was skeptical of the $1.24 million valuation, Conte indicated that this price was necessary to retain his cooperation in real estate deals, particularly concerning TMBRS Properties, and remain qualified for the (fictitious) Forthcoming Real Estate Transaction.

168.   These statements were false. The people making them knew they were false or made the statements with a reckless disregard to their truthfulness. A broker's price opinion has valuated this property at $500,000.00 at the time of the Scipio Station Transaction.

169.   Brinton relied on these false statements and agreed to purchase this property for $1.24 million. If Brinton had known that the above statements were false, he would not have entered into this agreement.

170.   Hansen persuaded Brinton to allow him to manage this property by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing properties, particularly gas stations/convenience stores, and that he was "an honest guy." These statements were false. In reliance on this representation, Brinton allowed Hansen to manage this property, with the help of Branden Hansen and Quayle.

171.   As managers of the Scipio Station, Hansen, Branden Hansen, Quayle, and Turner diverted income and assets from Junction Scipio. Quayle, an employee of Hansen and Branden Hansen, oversaw the management of this gas station and these four conspired

to divert funds and assets. Quayle and Branden Hansen allowed associates of Hansen to pump free gas in exchange for favors to Hansen. Hansen, Quayle, Branden Hansen, and Turner also failed to ensure all of the cash proceeds were deposited into the bank accounts set up by Junction Scipio. When pressed on the issue of there being little or no cash income deposits, Quayle replied that it was simply "off season." On information and belief, Hansen, Quayle, Branden Hansen, and Turner appropriated this cash income to their personal uses and/or for the Defendants. As manager, Hansen, Branden Hansen, Quayle, and Turner were tasked with making the monthly mortgage payment to Trophy. Because of these diversions of income and assets, there were insufficient funds available to make these payments, and these Defendants did not notify Plaintiffs of the shortfall. Trophy has declared Junction Scipio to be in default and, on information and belief, has initiated the foreclosure process.

172.    In May 2017, Brinton terminated Hansen and his underlings as property managers; however, Hansen and his underlings, including Branden Hansen and Quayle, have refused to leave the property, and continue to sell inventory owned by Junction Scipio and to divert and deplete this station's income and assets.

### 13.    Springdale Station Transaction

173.    On or around March 15, 2017, Junction Springdale acquired a gas station and convenience store (operation and real estate) in Springdale, Utah ("*Springdale Station*"), from Trophy. This property was purchased with $9,795 cash, and $1.6 million of financing provided by Trophy secured by a mortgage.

174.    On or around March 15, 2016, but prior to the transaction, Hansen told Brinton that this property was worth $1.6 million to persuade Brinton into participating in the Springdale Station Transaction. Hansen told Brinton this during purchase negotiations at Hansen's office with Bryan Brinton, Scott Brinton, Tom Meyer, Munoz, David Turner, and Branden Hansen present.

COMPLAINT

- 45 -

175.   Prior to this purchase, Conte met with Brinton, and asked him to purchase the Springdale Station. In return, Conte promised to further assist Brinton to participate in the Forthcoming Real Estate Transaction.

176.   To the extent Brinton was skeptical of the $1.6 million valuation, Conte indicated that this price was necessary to retain his cooperation in real estate deals, particularly concerning TMBRS Properties, and remain qualified for the fictitious Forthcoming Real Estate Transaction.

177.   These statements were false. The people making them knew they were false or made the statements with a reckless disregard to their truthfulness. A broker's price opinion has valued this property at $450,000.00 at the time of the Springdale Station Transaction.

178.   Brinton relied on these false statements and agreed to purchase this property for $1.6 million. If Brinton had known that the above statements were false, he would not have entered into this agreement.

179.   Hansen persuaded Brinton to allow him to manage this property by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing properties, particularly gas stations/convenience stores, and that he was "an honest guy." These statements were false. In reliance on this representation, Brinton allowed Hansen to manage this property, with the help of Branden Hansen and Quayle.

180.   As managers of the Springdale Station, Hansen, Branden Hansen, Quayle, and Turner diverted income and assets from Junction Springdale. Defendant Quayle, an employee of Hansen and Branden Hansen, oversaw the management of this gas station and these four conspired to divert funds and assets. Quayle and Branden Hansen allowed associates of Hansen to pump free gas in exchange for favors to Hansen. Hansen, Quayle, Branden Hansen, and Turner also failed to ensure all of the cash proceeds were deposited

COMPLAINT

into the bank accounts set up by Junction Springdale. When pressed on the issue of there being little or no cash income deposits, Quayle replied that it was simply "off season." On information and belief, Hansen, Quayle, Branden Hansen, and Turner appropriated this cash income to their personal uses and/or for the Defendants. As manager, Hansen, Branden Hansen, Quayle, and Turner were tasked with making the monthly mortgage payment to Trophy. Because of these diversions of income and assets, there were insufficient funds available to make these payments, and these Defendants did not notify Plaintiffs of the shortfall. Trophy has declared Junction Springdale to be in default and, on information and belief, has initiated the foreclosure process.

181.    In May 2017, Brinton terminated Hansen and his underlings as property managers; however, Hansen and his underlings, including Branden Hansen and Quayle, refused to leave the property, and continued to sell inventory owned by Plaintiff Junction Springdale and to divert and deplete this station's income and assets until being evicted by the Utah State Court.

### 14.    Panguitch Station Transaction

182.    On July 13, 2016, Junction Panguitch acquired the Panguitch Station from an entity controlled by Branden Hansen.

183.    Hansen persuaded Brinton to allow him to manage this property by stating in a telephone conversation on or around February 19, 2016, that he had fourteen years of experience managing properties, particularly gas stations/convenience stores, and that he was "an honest guy." These statements were false. In reliance on this representation, Brinton allowed Hansen to manage this property, with the help of Branden Hansen, Turner, and Quayle.

184.    As managers of the Panguitch Station, Hansen, Branden Hansen, Quayle, and Turner diverted income and assets from Junction Panguitch. Quayle, an employee of Hansen and Branden Hansen, oversaw the management of this gas station and these four

conspired to divert funds and assets. Quayle and Branden Hansen allowed associates of Hansen to pump free gas in exchange for favors to Hansen. Hansen, Quayle, Branden Hansen and Turner failed to ensure all of the cash proceeds were deposited into the bank accounts set up by Junction Panguitch. When pressed on the issue of there being little or no cash income deposits, Quayle replied that it was simply "off season." On information and belief, Hansen, Quayle, Branden Hansen, and Turner appropriated this cash income to their personal uses and/or for the Defendants. As managers, Hansen, Branden Hansen, Quayle, and Turner were tasked with properly managing the Panguitch Station property.

185.    In May 2017, Brinton terminated Hansen and his underlings as property managers; however, Hansen and his underlings, including Branden Hansen and Quayle, refused to leave the property, and continued to sell inventory owned by Junction Panguitch and to divert and deplete this station's income and assets. When an order of restitution was issued by a Utah District Court, Defendants pillaged the property, removing assets or selling them at fire-sale prices.

### F.    Further Fraudulent Activity

#### 1.  The Nevada Property Fraud

186.    On or around August 11, 2016, ZibalStar entered an agreement with Hansen and Zurich, and RLT Properties #4, LLC ("*Nevada Agreement*").

187.    Pursuant to the Nevada Agreement, ZibalStar paid Hansen $40,000.00 to purchase certain real property in Nevada known as Eagle Ridge Homes ("*Eagle Ridge Property*").

188.    No property was ever purchased by Hansen and Zurich under this Nevada Agreement, Eagle Ridge Property or otherwise. At present, ZibalStar's $40,000.00 is unaccounted for.

189.    Defendant Hansen has rebuffed ZibalStar's demands for return of the $40,000.00 as well as its demands for an accounting.

COMPLAINT

190.    Upon information and belief, Hansen and Zurich converted ZibalStar's $40,000.00 to his and/or its personal use and/or used it for unauthorized purposes unrelated to the alleged purchase of the Eagle Ridge Property.

### 2.    Illegal Check Kiting Schemes

191.    Hansen and the Estrella Entities twice bounced the same $8,026.33 check to the insurance carrier for Whispering Oaks, which TMBRS leases. The bounced check purported to be signed by Bryan Brinton, when he had no knowledge of the check and his signature was affixed without his authorization. Hansen and the Estrella Entities did not respond to the insurance agent's requests for payment.

192.    On or around May 24, 2017, Seven Peaks Provo learned Hansen and the Estrella Entities bounced two checks to Zamp HR Services LLC in the amounts of $54,461.75 and $36,270.87, which were intended to cover Seven Peaks Provo's May 19, 2017, payroll.

193.    In a similar pattern, Hansen, Turner, Munoz, and Branden Hansen ("*Check Kiting Defendants*") caused checks on all of Plaintiffs' accounts at Bank to be printed from the accounting system when they knew that the accounting system automatically affixed Bryan Brinton's signature to these checks when Bryan Brinton had no specific knowledge of the individual checks, and his signature was affixed without his authorization. Bryan Brinton specifically instructed these Defendants not to write checks unless they were written to a valid vendor with a legitimate invoice and there was money in the account to cover the checks.

194.    On a daily basis, Warwood and Peterson at Bank encouraged, aided, and abetted this behavior by contacting the Check Kiting Defendants every morning around 9:00am to inform them what checks were being presented to Bank so that they could decide on a case by case basis whether or not to bring funds to Bank to cover the check, or let it bounce. Responsible and ethical bankers would have closed the accounts after noticing a

pattern such behavior, as this constitutes "check kiting," or an illegal scheme to obtain credit through the use of check float time.

195.    Bankers at JP Morgan Chase, NA experienced a similar pattern from the Check Kiting Defendants, warned the parties involved, and quickly closed accounts of the Plaintiffs that were under the control of the Check Kiting Defendants.

196.    As a result of this illegal check kiting, which led to many bounced checks, Plaintiffs suffered reputational damage. This damage manifest in many forms, including that vendors of Plaintiffs began demanding cashier's checks or other certified funds. Plaintiffs, and their employees and agents, had to spend time, money, and attention obtaining certified funds to satisfy vendors, because the Check Kiting Defendants destroyed their reputations for writing honest checks.

197.    Additionally, when Brinton took management of these accounts back from the Check Kiting Defendants on May 30, 2017, unbeknown to Brinton, there were a substantial number of kited checks in circulation, which Brinton was forced to cover, as insufficient funds were present in the accounts.

198.    The other effect of this check kiting scheme was that, by taking advantage of this float time, and by using funds belonging to various Plaintiffs to cover the bad checks the Check Kiting Defendants wrote on other Plaintiffs' accounts, the Check Kiting Defendants, Bank, Warwood, and Peterson aided the entire enterprise complained of herein by helping to conceal problems with Defendants' management from Plaintiffs. Had the Check Kiting Defendants been unable to kite checks, the fraudulent enterprise complained of herein would have been uncovered sooner with less extensive damage to Plaintiffs.

199.    The Check Kiting Defendants, Warwood, Peterson and Bank knowingly and intentionally participated in this scheme to aid the Defendants in their fraudulent enterprise.

### 3. Vehicle Fraud

200.    On or about September 30, 2016, at approximately 4:00 p.m., in his office, Hansen told Brinton, Scott Brinton, Bryan Brinton, and Tom Meyer that he and/or entities he controlled intended to use proceeds from the sale of the Courtside Property to purchase a 2017 MasterCraft speedboat ("***Speedboat***") for $180,000.00 and a 2017 Cadillac Escalade ("***Escalade***") for $110,000.00 in the name of one or more Plaintiffs. Branden Hansen, Turner, and Munoz were also present at the meeting.

201.    During the meeting, Hansen represented that the Speedboat and Escalade would be used for company purposes and to generate company revenues. Specifically, Hansen represented that he would sell timeshares for the Speedboat's use, the revenues from which would be paid to one or more of the Plaintiffs. Additionally, Hansen indicated that he would sell fractional shares and otherwise use the Speedboat to gain favor with potential investors for the Forthcoming Real Estate Transaction. The Escalade would be used to promote the image of Hansen, in aid of assembling the Forthcoming Real Estate Transaction.

202.    In reasonable reliance on Hansen's misrepresentations, the speedboat and Escalade purchases were approved by Brinton.

203.    In fact, at the time of the inducement, Hansen had no intention to put title to the Speedboat or Escalade in the name of any Plaintiff, make either of them accessible for company use, or apply any proceeds from their use to any Plaintiff.

204.    Instead, after using Plaintiffs' funds, Hansen purchased and titled the Speedboat and Escalade in the name of his own entity, on information and belief, Low Cost. The Speedboat, the Escalade, and all proceeds thereof were kept for his own use and/or the use of entities controlled by him, unrelated to any Plaintiff.

205.    No Plaintiff has had access to the speedboat or Escalade for any purpose.

206.    Hansen has refused requests to produce any alleged title to the Speedboat and/or Escalade.

207.    Because of Hansen's active concealment of the facts and documents related to the fraudulent Speedboat/Escalade scheme, the full facts of concerning how the Speedboat and Escalade were purchased, titled, stored and/or disposed of are uniquely known to the defendants and will be uncovered only through discovery and accountings.

208.    Plaintiffs have been damaged in that $290,000 of the Courtside Property proceeds have been converted to Hansen's use.

### 4.    Withheld Courtside Condominiums Mortgage and Lease Payments

209.    From April 10, 2017 until May 30, 2017, Hansen and the Estrella Entities were entrusted to exclusively manage the funds and payments of Plaintiffs. Hansen offered this service on his and the Estrella Entities' behalf in order to demonstrate the "abundance mentality" and show what he could do as fund manager. He also indicated this was necessary to proceed to the Forthcoming Real Estate Transaction.

210.    In this role, Hansen was given responsibility to ensure that all leases and mortgages were paid.

211.    Hansen did not do this. Lease and mortgage payments for April and May of 2017 were not made on numerous properties owned by Plaintiffs.

212.    Failure to pay these payments placed Plaintiffs in default and created difficulties with lenders. It also subjected Brinton as a personal guarantor to liability.

213.    These actions have damaged Plaintiffs, who have incurred defaults, late fees and related expenses, and financial difficulties as a result.

### 5.    Blue Fun and Other Misrepresentations

214.    On May 4, 2017, Hansen and Hanna established Blue Fun. Subsequently, Weller and Perry provided funds to Hansen through Blue Fun on the false representation by Hansen that Blue Fun controlled the income stream of Seven Peaks Provo. Brinton had multiple conversations with Weller and Perry about loaning money to Hansen without confirming facts with Brinton. Despite being instructed multiple times, because of their

greed and desire to make large returns on loans that they believed they could force Brinton to pay, Weller and Perry purposely did not confirm Hansen's claims under the guise that they could just pursue Brinton to seek repayment. Brinton and Seven Peaks Provo had no knowledge of Hansen's misrepresentations, Blue Fun or the funds being provided by Weller and Perry to Hansen through Blue Fun.

215.    In June 2017, Brinton was informed by Perry that Perry and Weller had provided Hansen with $150,000 in funds for the purpose of buying 4 homes from ROC. Brinton and ROC had no knowledge of Hansen's misrepresentations to Weller and Perry, that the 4 homes had been sold to Weller and Perry, or any knowledge that $150,000 was paid to Hansen for properties owned by Plaintiff ROC.

### G.    Past Business Relationship with Hansen Built on Trust.

216.    Brinton had a long business relationship with Hansen in which Hansen established trust between them. The relationship began in the mid-1990's when Hansen was an insurance agent for MultiServe Insurance agency and Brinton engaged his services as his insurance agent. Between 1995 and approximately 2007, Hansen provided Brinton with several real estate opportunities to purchase assets from other insurance clients and acquaintances of Hansen.

217.    Pursuant to this relationship, Brinton purchased the Provo Water Park and Golf Course (later turned into a residential subdivision) from contacts introduced to Brinton by Hansen. Brinton made various purchases of property from a contact of Hansen. All of these property purchases (projects) were successful ventures. Thus, over many years, Hansen had provided reliable information about potential real estate transactions that were consummated by Brinton primarily due to the involvement and assistance of Hansen and his other insurance clients. Over that time period Hansen became a trusted business acquaintance and Hansen continued to act as a fiduciary for Brinton acting as his insurance agent up to the events outlined in this litigation. Brinton had relied on

information provided to him by Hansen over many, many years and Brinton had no reason to disbelieve any information that Hansen provided to him on the transactions that are the subject of this litigation.

218.     Thus, Brinton had a relationship of trust with Hansen as his trusted insurance agent, built up over many years, who was trusted to provide Brinton with reliable information. Then, there came a time in the relationship where Hansen stopped providing information to Brinton on transactions because Hansen took those opportunities elsewhere or did those projects himself. But, Brinton continued his relationship with Hansen with regard to insurance, and continued to believe Hansen was trustworthy, and in particular continued to have a good-faith belief that Hansen was telling the truth regarding the subject transactions and was providing truthful and accurate financial information and other representations.

### H.     Plaintiffs' Transactions Had a Legitimate Business Purpose

219.     Plaintiffs overall purpose was profit motivated, with the secondary aim to realize legitimate and legal tax advantages flowing from the transactions. Plaintiffs relied upon misrepresentations by Hansen to invest in the Transactions described herein with the ultimate aim to accumulate enough "doors" to invest in the "Forthcoming Real Estate Transaction," which, if fulfilled would be very profitable for Brinton and his entities. Plaintiffs relied upon Hansen's presentations that with the cooperation of Conte, who owned a significant number of properties, the very profitable real estate transaction would be realized. Plaintiffs invested millions of dollars down as deposits on properties in which they would have option to purchase but were then led into default by misrepresentations by Defendants/property managers described herein working at the behest and direction of Conte and Hansen. Plaintiffs were solicited because of Brinton's business knowledge, and strong financial credit.

## V.        CLAIMS FOR RELIEF

### A.        CLAIM ONE: RICO 18 U.S.C.A. §§ 1962(c) – Against Defendants Hansen, Halliday, Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.

220.    Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

221.    At all times relevant, Conte, Hansen, and Halliday, and entities controlled by them, are persons as described in 18 U.S.C. § 1961(3) in that they are individuals capable of holding a legal or beneficial interest in real property.

### 1.  The Enterprise.

222.    Conte, Hansen, and Halliday, along with the entities they controlled, and other individual defendants and entities, alleged as RICO Conspiracy Defendants in Claim II, constituted an association in fact enterprise as described in 18 U.S.C. § 1961(4) (collectively referred to as the "*Conte/Hansen Enterprise*"). This Enterprise meets the *Boyle* factors discussed below, and thus exists separate and apart from the pattern of racketeering, which consists of multiple acts of mail fraud and wire fraud. Conte, Hansen, and Halliday are each different and distinct from the association in fact Enterprise whose members function together as a continuing unit.

223.    The Enterprise's activities affected interstate or foreign commerce as Enterprise members sell properties, goods and services in multiple states. The Conte/Hansen Enterprise members and associates defrauded Plaintiffs of assets, including money, personal property, and dozens of properties located in at least four different states. Several of these properties were service stations, supplying fuel and food to interstate travelers. Several of these properties were for residential housing, and the housing business is substantially interstate because of the interstate movement of building materials, mortgage funds, and advertising, as well as the movement of workers and their families.

224.    The constituent members of this association-in-fact enterprise functioned as continuing unit and had the requisite structural features as mandated by *Boyle v. United States. First*, it had a purpose, as Conte, Hansen, and Halliday, with other individuals and entities at their direction, devised a scheme to defraud Plaintiffs by fraudulently inducing Brinton into entering a series of fourteen (14) real property transactions ("the Transactions"), as described in detail *supra*, para. 79-184, that have defrauded Brinton out of tens of millions of dollars. This plan began on February 19, 2016, when Hansen first began to induce Brinton into entering into the Transactions (see *supra*, para. 66) by promising him that Plaintiffs' participation in these Transactions would lead to Plaintiffs having the opportunity to participate in the Forthcoming Real Estate Transaction involving financing to rehabilitate and stabilize these newly acquired properties which Plaintiffs could then sell to a new group or entity ("***Purported Buyer***"), who would purchase these properties for double their cost to Plaintiffs. As part of the fraudulent scheme, Conte, Hansen, Perry and Weller, with the other Enterprise members, (i) sold properties to Plaintiffs at inflated prices; ii) defrauded Plaintiffs of funds under management; and iii) intentionally failed to make mortgage and lease payments so as to harm Plaintiffs/lessees so that the properties could be foreclosed upon.

225.    Second, there were relationships among those associated with the enterprise as the Conte/Hansen enterprise was led by Conte and Hansen, who directed the other members of the Enterprise to engage in the fraudulent inducement and fraudulent management of Plaintiff's properties. [See *supra.*, para. 68.]  There are numerous What's App and SMS text messages in which Conte/Hansen are together on the texts, along with Brinton, discussing the transactions. See, e.g., there are texts on August 25, 2016, August 30, 2016, October 4, 2016, October 11, 2016, December 8, 2016, January 16, 2017, February 27, 207, and April 3, 2017 in which Hansen, Conte, and Brinton communicated discussing potential transactions, and these texts will be provided to Defendants in discovery. In

particular, these latter four texts (December 8, 2016, January 16, 2017, February 27, 207, and April 3, 2017) involve Conte accusing Brinton and stating that TMBRS had not made capital improvements to properties that Conte demanded be made, ultimately forcing Brinton to pay bills for improvements. See, *supra.*, para. 113-114.

226.    Under their direction, the Forthcoming Real Estate Transaction was to be assembled by RICO conspiracy defendant Odenath, with assistance by Fairchild, and financing to rehabilitate and stabilize the properties was to be provided by Halliday, with the participation of Conte. Enterprise members Odenath, Munoz, Halliday, Fairchild and Conte made misrepresentations to Brinton that supported Hansen's statements, and helped to convince Brinton that the Transactions needed to be entered into in order for Plaintiffs to participate in the Forthcoming Real Estate Transaction. See *supra.*, para. 67-74.

227.    Further relationships involved Enterprise members Quayle, Turner, and Munoz, who under the direction of Hansen, participated in the false and non-existent Forthcoming Real Estate Transaction scheme. They also oversaw the management of Plaintiffs' properties, which included apartments, cabins and gas stations, and diverted monies and income with the aim that the Plaintiffs were unable to make lease or mortgage payments and Conte or Hansen could evict them (forfeiting option deposits) or foreclose on the properties. See, e.g., *supra*, para. 163-171, the Scipio Station transaction. Other Enterprise members Hanna, Grande, Garcia, and Manriquez, defrauded Plaintiffs by diverting monies from Plaintiff properties so as to force Plaintiffs into default thereby allowing Conte to evict or foreclose on the properties. See *supra.*, para. 29; 32; 33.

228.    Enterprise members and associates also functioned together with a purpose with regard to the further fraudulent activity outlined in section IV.C above. Enterprise members Warwood and Peterson, along with the Estrella Entities (*supra.*, para. 190-198), assisted in "check-kiting" which thereby concealed the problems with Defendants'

management of properties and prevented the earlier detection of the fraudulent scheme. Hansen, with other Enterprise members, conducted the Vehicle Fraud scheme, *supra.*, para. 199-207, which was related to the other schemes as Hansen misrepresented that the sale of fractional shares of the Speedboat would be used to gain favor with potential investors of the Forthcoming Real Estate Transaction.

229.    Other Enterprise members such as Perry, Weller, and Enloe worked with Hansen and/or Conte on real estate transaction frauds designed to committing the additional frauds. See Weller, *supra.*, para. 39; and Perry, *supra.*, para. 40, fraud involving Junction Island Park using Blue Fun Group; Enloe, *supra.*, para. 38, fraud to cause Plaintiffs to lose the Sunset Apartments in Las Vegas, Nevada. Conte entered into similar fraudulent schemes regarding the McKinley Court Default, *supra.*, paras. 216-219, with conspirators, such as Perry. Hansen worked with Enterprise members and conspiracy defendants Weller and Perry to continue to defraud Plaintiffs, as late as June 2017. *supra.*, paras. 213-214.

230.    Lastly, there was longevity sufficient to pursue the relationships between the members of the Enterprise as the fraudulent activity began at latest in February 19, 2016, with the initial inducement by Hansen (*supra.*, para. 65) and have continued until the present day. See *supra.*, paras. 116; 153; 162; 171; 180; 184 (Ted and Branden Hansen have caused their underlings to refuse to leave properties and continue to sell-off inventory and assets to divert and deplete the properties assets and income); breaches by Hansen have continued after filing of the Complaint and First Amended Complaint in the prior action styled *ZibalStar et al. v. Conte et al.*, US District Court, Utah Case No. 2:17-cv-00563-JNP-EJF, *i.e.*, breaches in the terms of a Partial Settlement Agreement entered into between Brinton, Hansen, and Perry on or about December 6, 2017.

### 2. Conducting Affairs of the Enterprise

231.    Defendants participated in the "operation or management" of the Enterprise's affairs. Conte and Hansen were the leaders in the association in fact Enterprise who, using the mails (including commercial carriers) and interstate wires, induced Plaintiffs to enter into the Transactions with false promises, including the false representation that Plaintiffs could participate in the Forthcoming Real Estate Transaction. Conte and Hansen devised the scheme to sell or lease properties to Plaintiffs at inflated prices and divert monies from properties leased to Plaintiffs with an option to purchase so that Conte/Hansen could evict or foreclose on the properties. They led others in the further fraudulent activity described in IV. above. Halliday had some direction as they worked with other Enterprise members, many of whom are named as RICO Conspiracy Defendants herein, to misrepresent that they were assembling the Forthcoming Real Estate Transaction. *supra.*, para. 31; 72.

### 3. Racketeering Violation

232.    From in or about February 2016 and continuing until the present, Hansen and Halliday, including Entity Defendants controlled by these Defendants; persons associated with Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity, *i.e.*, acts indictable under 18 U.S.C. § 1341 and 1343, all in violation of 18 U.S.C. § 1962(c).

### 4. Racketeering Activity

233.    These substantive individual RICO Defendants, and the Entity Defendants controlled by them, participated in the affairs of the Enterprise through the commission of multiple acts of mail and wire fraud. The fraudulent scheme involved using the mails and wires to fraudulently induce and cause Brinton and his entities to engage in the Transactions and further the fraudulent scheme as follows:

COMPLAINT

- Misrepresentations that Brinton's participation in the transactions at issue would result in an opportunity to participate in the Forthcoming Real Estate Transaction;

- Misrepresentations that the value of the properties to be transferred to Brinton were greater than they were;

- The Cap Rate applicable to the Forthcoming Real Estate Transaction would be no more than half the Cap Rate used to calculate the purchase prices of the properties Plaintiffs acquired in the Transactions, creating the opportunity for Plaintiffs to double their investments;

- Brinton would achieve a 100% return on his investment when he eventually participated in the Forthcoming Real Estate Transaction;

- RICO conspiracy Defendants Odenath, and Fairchild, and Halliday were actively working to assemble the Forthcoming Real Estate Transaction;

- Hansen and/or Conte in fact owned all the properties exchanged to Brinton; Hansen and Conte, and misrepresented that persons under their control and influence, i.e., Grande, Manriquez, Garcia, Munoz, Quayle, and Turner, would be honest and competent property managers.

### 5.    Mail Fraud

234.    In furtherance of their scheme to defraud, and with the purpose of executing their scheme to defraud, Defendants described herein, used mail to correspond with Brinton and each other, to solicit information from Brinton and each other, to run the day-to-day operations of the Conte/Hansen Enterprise, to induce Brinton to enter into the defrauding transactions at issue, and to share and execute the agreements that led to Brinton being defrauded, all in violation of 18 U.S.C. § 1341. The following mailings, including the use of private and commercial intestate carriers, such as Fed Ex, UPS, etc., were sent by Defendants Conte and Hansen in furtherance of the scheme to defraud:

- mailings of closing documents for each of the Transactions, as described in detail in para. 77-182, caused by Conte and Hansen;

- mailings of closing documents associated with the Further Fraudulent Activity, caused by Conte and Hansen, as described in detail in para. 183-221.

### 6.      Wire Fraud

235.     In furtherance of their scheme to defraud, and with the purpose of executing their scheme to defraud, Defendants described herein, used interstate wires to correspond with Brinton and each other, to solicit information from Brinton and each other, to run the day-to-day operation of the Conte/Hansen Enterprise, to induce Brinton to enter into the defrauding transactions at issue, and to share and execute the agreements that led to Brinton being defrauded, all in violation of 18 U.S.C. § 1343.

236.     These interstate wirings by Conte, Hansen, and Halliday, consisted of a) interstate telephone calls; b) text messages made through computer servers in different states, *i.e.*, texts utilizing What'sApp and SMS, which route text messages through multiple states and are therefore wires in interstate commerce;[14] c) wire transfers of monies through the financial banking system; and (d) e-mails which constitute interstate transmissions made in furtherance of the scheme to defraud. These interstate wirings described below, were

---

[14]     What's App texting service routes text messages through the user's internet connection and What'sApp servers located in Mountain View, California. The server then sends the message to the device of the receiver user, where ever he or she may be. See www.quora.com, "How Does Messaging Work in What's App." Thus, just like "e-mails," these What's App text messages are electronic messages which travel interstate between remote servers (in California) and the receiver user's device, where ever the device is being used.

SMS texting is similar in that messages are sent from a user's cell phone to a control tower, and then to a SMS center, which transmits the message to the closest cell tower of the user, and then to the receiver user. Cell phones of users communicate with different towers "as the user moves around the city, state, country, or even the world."www.techwalla.com, "How Does Text Messaging Work." Thus, SMS texting operates similar to electronic messages which are transmissions commonly through remote servers and would be considered interstate transmissions.

COMPLAINT

made by Conte, Hansen, and Halliday to further the Conte/Hansen Enterprise's scheme to defraud Plaintiffs of valuable assets they held. Brinton would not have entered into the transactions at issue if he had known that these statements were false. These wires attributed and caused by Conte, Hansen, and Halliday, with specificity as to each individual Defendant, consist of, but were not limited to, the following:

237. Wire Transfers of Earnest Money Deposits:

- para. 107; on June 20, 2016, Winchester used interstate wires to send $220,000 to Hansen to use as an earnest money down-payment to the purchase of Star Re, LLC. Hansen did not transmit these funds but instead kept them for himself and own use.

- para. 216-219; In late fall 2016, Brinton wired $350,000 to Perry as earnest money on the purchase of the McKinley Property, which on the eve of closing was learned that Conte was claiming an interest in the property, thereby enabling Perry to obtain title to the McKinley Property through a foreclosure action.

238. Other Electronic Mail in Furtherance of the Scheme: There are many e-mails between the parties, many in furtherance of the scheme, and these constitute prohibited interstate transmissions.[15] These include:

- E-Mails from Conte dated December 10, 2016 to Brinton, copying Hansen Re: TMBRS Property Closings, misrepresenting the value of the TMBRS properties.

---

[15] Conte uses a @aol.com account and Hansen use a @hotmail account. See December 10, 2016 e-mail from Conte to Brinton copying Hansen. According to sources, Hotmail is a "web-based e-mail service provider" which is hosted by **remote** servers and mail can only be viewed through an internet connection. Source: "*How Does MSN Hotmail Work,*" Chron magazine. AOL similarly, since year 2005 to the present, operates as a free webmail service which like all other web mail programs runs over the internet using standard web browsers. It similarly requires an internet connection to operate which is hosted by remote servers. "*How Does AOL Mail Work,*" Tech Magazine. Thus, it is alleged that because in each program e-mail messages travel through the internet through remote servers the e-mails are considered interstate wirings.

- E-Mail from conspirator Dave Turner dated July 8, 2016, to Brinton and conspirator Jeff Munoz, *Subject: Financials for Tres: Manzana, and Sierra*, "Ted wanted me to remind you that the Berkadia was offering a 7 cap and with the NOI he believes the properties are worth the following prices…" The value of the properties are set forth and are greatly overstated.

- E-Mail to Brinton dated May 11, 2017 from Elisabeth Arellano, stating that "Just wanted to follow up after our meeting with Ted. He walked us through the ownership group and how he is now a 50% owner of Seven Peaks along with your family." These are false representations as the ownership of the park was not as Hansen represented it (notes to e-mail).

239. Interstate Telephone Calls:

- Para. 70, in about September 2016, Hansen placed a telephone call from Utah to Odenath, a citizen of Florida (in Florida at the time), with Plaintiffs on the line, where Odenath made misrepresentations regarding the fictitious Forthcoming Real Estate Transaction;

- Para. 79, in or around the middle of June 2016, Conte placed an interstate call from Nevada to Brinton in Utah to further the fraudulent investment in Dewey Properties;

- Para. 84, in or around late June 2016, Conte, a Nevada citizen, placed a telephone call from Nevada to Brinton in Utah making misrepresentations to induce Brinton to continue to use the same management personnel for the Dewey Properties;

- Para. 91, in or around July 2016, Conte, a Nevada citizen, placed a telephone call from Nevada to Brinton in Utah making misrepresentations to induce Brinton to lease, with option to buy, the Sierra Point Property, and e-mail

communications were further made in execution of the fraudulent scheme to lease Sierra Point;

- Para. 96; in or around July 2016, Conte, in Nevada, made a telephone call to Brinton, in Utah, falsely stating that Defendant Manriquez was a competent property manager who could be trusted. Conte also later threatened in a text message sent from Nevada to Brinton in Utah in November 2016, "[i]f you want my cooperation, you need to let Eric [Manriquez] run the properties properly in the manner I would expect them to be run." In reliance on these statements, Brinton continued to use Manriquez's services to manage the property.

- Para. 112; regarding the six TMBRS Properties in Tulsa, Oklahoma, in or around July 2016, Conte, in Nevada, further represented to Brinton via telephone call to Utah that Manriquez was a competent property manager who could be trusted. In November 2016, Conte, in Nevada, sent a text message to Brinton stating, "[i]f you want my cooperation, you need to let Eric [Manriquez] run the properties properly in the same manner I would expect them to be run."

- Para. 127; in mid-July 2016, Conte, in Nevada, made further representations to Brinton via telephone to Utah that Garcia was honest, was a pastor, and could be trusted to manage the Highland Oaks Property;

240.   Text Messages Through What'sApp and SMS: Documents reveal over 30 text messages between Hansen and Brinton between March 5, 2016 and May 19, 2017, all through What'sApp and SMS. There also fourteen (14) text messages in which Conte, Hansen, and Brinton were together senders or receivers, as well as many text messages directly between Conte and Brinton from March 2016 through May 2017. There were also text messages caused by Halliday in furtherance of the scheme to defraud. These

messages were in furtherance of the schemes to defraud, and in discovery extensive documents showing the entire texts will be provided in total. In particular, some of the What'sApp text exchanges between certain Defendants, described below, with Brinton include the following:

- On September 24, 2016 and March 8, 2017, Hansen texted to Brinton photographs of potential real estate properties in various states, including California, Nevada, Georgia, and Florida as properties that Brinton can purchase. These texts were sent by What'sApp, and additionally, were sent while Hansen was out of state back to Brinton in Utah. These texts were meant to induce Brinton into purchasing more properties presented to Brinton from Hansen so that Plaintiffs could qualify for the Forthcoming Real Estate Transaction.

- In connection with the Dewey Transaction, the complaint describes numerous in person meetings between Brinton and Hansen to discuss the fraudulent transaction in which the values of the properties were misrepresented. *supra.*, para. 71-73. Hansen sent numerous texts to Brinton to arrange these meetings, and thus these texts were in furtherance of the scheme to defraud. See, texts on March 5, 2016 (to arrange meeting); text on March 7, 2016, to arrange the meeting; text on April 4, 2016 to arrange for a meeting at Wayne Ross's home to discuss potential transactions; text on May 11, 2016, to arrange for tours of the Dewey Properties in which Hansen misrepresented the value of these properties. *supra.*, para. 80.

- Regarding the Southern Oaks Transaction, there were in person meetings at Wayne Ross's house in which was attended by Hansen and Brinton on April 4, 2016, in which Brinton was told that purchasing Southern Oaks would assist him in qualifying for the Forthcoming Real Estate Transaction.

*supra.*, para. 110. There were texts between Hansen and Brinton to arrange these meetings, and thus are in furtherance of the scheme to defraud. Texts on April 4, 2016 to discuss due diligence at Wayne's home; also text on June 23, 2016, between Brinton and Hansen in which Brinton asks Hansen for written proof from Conte so that Southern Oaks can close.

- As described in *supra.*, para. 73, in or around February or March of 2017, Brinton met with Halliday at Halliday's office in Salt Lake City, Utah. At this meeting, Halliday made the false representation that he planned to fund the rehabilitation and stabilization portion of the Forthcoming Real Estate Transaction for at least $100 million, with $30 million committed to properties identified and either owned or leased by Plaintiffs. In the weeks following, Halliday continued to make the false representations that funding for the properties to be involved in the Forthcoming Real Estate Transaction was imminent. As Brinton later discovered, the funding never came. Halliday made these representations knowing they were false or with a reckless disregard for their truthfulness because the non-profit funding entity, *i.e.*, *Agradecido Foundation*, of which Halliday was a director and registered agent, was defunct and could never have provided the funding. Also, Hansen sent numerous texts to Brinton relaying information provided by Halliday which were made in furtherance of the scheme to defraud: What's App texts on January 4, 2017 (Hansen relayed in text that Halliday was discussing closing next week and discusses full deal terms); January 24, 2017 (Hansen relaying in text that Halliday will fund no matter what); January 27, 2017 (Halliday will fund on Monday); February 15, 2017 (Hansen relays Halliday confirmation e-mail to Brinton); February 24, 2017

(Halliday will fund Monday afternoon); March 14, 2017 (Halliday is wiring $15 million the next day).

### 7.      Pattern of Racketeering

241.    From at least February 19, 2016, until the present time, the substantive individual RICO Defendants, and entities they controlled, engaged in a pattern of racketeering whereby they continuously engaged in racketeering activity as described above.

242.    This racketeering activity had both "continuity" and "relatedness" thereby constituting a pattern as that term is defined in 18 U.S.C. § 1961(5). Plaintiff can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." Here, the acts of fraud were related to the affairs of the Enterprise as Conte, and Defendants Hansen and Halliday worked together to obtain something of value, *i.e.*, the payment of monies by Plaintiff induced by fraudulent misrepresentations, and Plaintiffs service properties. Conte, and Defendants Hansen and Halliday had the same purpose, *i.e.*, to obtain Plaintiffs' properties and induce Plaintiff to enter into fraudulent real estate transactions; the same results, in that Conte, Hansen, and Halliday would reap financial gain at the expense of the Plaintiffs, and the same methods of commission, by lying about the value of properties, lying that defendants would be honest property managers, and lying about the existence of the mythical Forthcoming Real Estate Transaction.

243.    Plaintiffs alleges that the pattern of racketeering activity constituted closed-ended continuity as these were continuous acts occurring over a substantial period of time, *i.e.*, from at least March 2016 to the present time. There are many predicate acts of interstate wirings made with texts through What'sApp and SMS, from as early as March 5, 2016, continuing through at least May 11, 2017. *See* a What'sApp exchange between Hansen and Brinton, on March 5, 2016 to set up the initial meeting to "talk real estate," and e-mails on May 9, 2017, in which Hansen informs Brinton that he has received the "monthly

bills," and e-mail dated May 11, 2017, above, from Arellano setting forth Hansen's false representations regarding ownership of Seven Peaks.

244.    In addition to this duration, the various factors outlined in *Resolution Trust v. Stone* are met, *i.e.*, there are a number of entity and individual victims; there are scores of wirings and text messages between the parties made in furtherance of the scheme to defraud; there are a variety of racketeering acts, including frauds involving purchase of properties; leases of properties; false promises to participate in the Forthcoming Real Estate Transaction; check-kiting, tax evasion, and fraudulent representations regarding the management of the properties leased with option to buy by Plaintiffs. There is distinct injury resulting from the loss of value of the properties represented to Plaintiffs; diversion of income from properties as represented to Plaintiffs; diversion of income from the properties under the control of the Conte/Hansen Enterprise. *Infra*, para. 245-247 and 253-255, below alleging injury directly and proximately caused by Defendants

245.    Plaintiffs also alleges that, alternatively, the pattern of racketeering activity constituted "open-ended" continuity as there is the threat of continuing racketeering activity because the predicate activity is continuing to this present time; *i.e.*, since the filing of the initial and first amended complaint there has been a Partial Settlement Agreement executed between Brinton, Hansen, and Perry on December 7, 2017. Hansen has breached some of the terms of this Partial Settlement Agreement, and thus the fraudulent activity has continued. Moreover, the criminal conduct described herein has been so pervasive that it gives rise to the inference that Defendants will commit such offenses against Plaintiffs and others as part of "their regular way of doing business," and thus will continue indefinitely if not interrupted.

### 8.    Proximate Causation and Relief

246.    As a direct result of Conte's and Defendants Hansen's and Halliday's illegal racketeering activities constituting mail and wire fraud, Plaintiffs sustained economic

damages. But for Defendants' predicate illegal racketeering activities Plaintiffs would not have sustained economic damages.

247.     Defendants Hansen's and Halliday's illegal racketeering activities, outlined with respect to each Defendant above, were a direct and proximate cause of Plaintiffs' sustained economic damages.

248.     These illegal acts directly and proximately injured Brinton in that he exchanged properties of a higher value for properties of a much lower value and otherwise overpaid for properties. In some cases, the properties exchanged to him in fact had a value less than half the value of the properties he exchanged to the Conte/Hansen Enterprise. Brinton was further injured in that Conte, Hansen, and Halliday diverted property income and assets, causing them to have insufficient funds to fulfill their duties as managers to make monthly lease and mortgage payments to Conte. Because they failed to notify Brinton, as a result, Conte is now claiming that the leases and mortgages in question are in default and is claiming that the properties are his own. Brinton has also been injured in that, despite acting in reliance on the Conte/Hansen enterprise's misrepresentations, he never realized the promised opportunity of doubling the value of his properties through participation in the Forthcoming Real Estate Transaction.

 **B.     CLAIM TWO: Conspiracy to Violate RICO 18 U.S.C.A. §§ 1962(d) – Against Defendants Hansen, Branden Hansen, Munoz, Turner, Hanna, Halliday, Odenath, Grande, Manriquez, Garcia, Quayle, Warwood, Peterson, Enloe, Weller, Perry, Fairchild, Bank, Estrella Group, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.**

249.     Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

250.     At all times relevant, Hansen, Branden Hansen, Munoz, Turner, Hanna, Halliday, Odenath, Grande, Manriquez, Garcia, Quayle, Warwood, Peterson, Enloe, Weller, Perry, Fairchild, Bank, and the Entity Defendants they controlled, as described in *supra.*, para.

56, were persons as described in 18 U.S.C. § 1961(3) in that they are individuals or legal entities capable of holding a legal or beneficial interest in real property.

251.   Plaintiffs allege that commencing from at least February 2016, and continuing until the present day, Hansen, Branden Hansen, Munoz, Turner, Hanna, Halliday, Odenath, Grande, Manriquez, Garcia, Quayle, Warwood, Peterson, Enloe, Weller, Perry, Fairchild, Bank, and the Entity Defendants conspired to violate section 1962(c), *i.e.*, each defendant agreed to conduct or participate in the affairs of the Enterprise, through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341 and 1243, as more fully described in Claim One. Plaintiffs allege that the conspiratorial objective of that mutual agreement between these RICO conspiracy Defendants was intended to obtain Plaintiffs' interests in business and property, and that such conspiratorial conduct violates RICO section 1962(d).

252.   Each RICO conspiracy Defendant intended to further the schemes to defraud, which as described in Claim One, were completed and satisfied by the substantive individual RICO Defendants Hansen and Halliday.

253.   It was a part of the conspiracy that each conspiracy participant agreed that Conte, and Defendants Hansen and Halliday would commit a pattern of racketeering in the conduct of the affairs of the enterprise. The agreement to violate RICO with regard to each RICO conspiracy defendant is as follows:

- As described above, conspiracy defendants Odenath, Fairchild, agreed that Hansen and Conte would engage in multiple acts of wire fraud and mail fraud associated with the misrepresentations regarding the Forthcoming Real Estate Transaction;

- Quayle, Turner, and Munoz agreed that the Hansens would participate in the false and non-existent Forthcoming Real Estate Transaction scheme. There are numerous e-mails between Brinton and Conte/Hansen where

COMPLAINT

Turner and Munoz were copied, see., e.g., e-mail dated June 3, 2016, from Brinton to Hansen, in which Munoz and Turner were copied, titled "Dewey," in which the ZibalStar L.C. purchase contract for Dewey is discussed;

- Hanna, Grande, and Manriquez agreed that Conte and Hansen would defraud Plaintiffs by embezzling monies from Plaintiffs' properties so as to force Plaintiffs into default thereby allowing Conte to foreclose on the properties. In fact, Manriquez is on texts with Brinton and Hansen/Conte regarding the operation of the properties. See, e.g., text dated November 17, 2016 involving Brinton, Conte, and Manriquez in which it is discussed that Manriquez needs to run the properties because Ted's staff is not competent. There is another text, dated December 8, 2016, between Conte, Hansen, Manriquez and Brinton in which it also discussed that Manriquez needed to be in charge of everything regarding operation of the properties. In each text, these are misrepresentations designed to have Manriquez mis-manage the properties so that the lessee Plaintiffs would be driven to default on their lease payments.

- As described *supra.*, paras. 190-198, Turner, Munoz, and Branden Hansen, agreed that substantive defendant Ten Hansen, would without authorization automatically affix Bryan Brinton's signature to checks without his knowledge for the purpose of "check-kiting," which caused the hiding of the scheme from Plaintiffs. Warwood, Peterson, and the Bank participated and furthered this fraud. See, *supra.*, para. 193. Turner also drafted the July 8, 2016 e-mail forwarding Ten Hansen's overstatements of the values of Tres Palms, Manzana Grove, and Sierra Pointe properties.

COMPLAINT

- Weller worked with Hanna, Perry, and Hansen with regard to the misrepresentations regarding Blue Fun. See, *supra.*, para. 213-14; and

- In or around September of 2016, over the telephone, Odenath, from Florida, misrepresented to Brinton in Utah, that he was assembling the Forthcoming Real Estate Transaction and had funding and purchasers available, but in fact he had no such funding or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction; see *supra.*, para. 72.

### 1.   Proximate Cause and Injury

254.   As a result of Defendants' agreement that conspirators would commit racketeering activities, Plaintiffs sustained economic damages.

255.   But for Defendants' agreement that conspirators would commit predicate illegal racketeering activities Plaintiffs would not have sustained economic and non-economic damages

256.   Defendants' agreement that conspirators would commit illegal racketeering activities, i.e., the effecting of acts of mail and wire fraud, was a direct and proximate cause of Plaintiffs sustained economic damages, as described above.

### C.   CLAIM THREE: State Law Fraud Regarding the Forthcoming Real Estate Transaction – Against Hansen, Halliday, Odenath, and Fairchild.

257.   Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

258.   Hansen represented to Brinton that the Forthcoming Real Estate Transaction was presently being assembled by Odenath, with the assistance of Fairchild, and that it was being assembled to provide Brinton with the opportunity to double his money. Hansen represented to Brinton that the purchasers involved in the Forthcoming Real Estate Transaction would purchase the properties at a Cap Rate that was half the Cap Rate at which Brinton had purchased the properties in question. Hansen further represented that

by entering into the real estate transactions at issue with Conte, Brinton would be taking present steps to qualify to have the opportunity to participate in the Forthcoming Real Estate Transaction. Hansen further represented that Halliday was presently gathering and would provide the necessary funding for the properties to be involved in the Forthcoming Real Estate Transaction.

259.    As alleged above, Conte represented to Brinton that it was necessary to use his managers on various properties acquired in the Transactions so as to remain in good standing for the Forthcoming Real Estate Transaction. These representations, among other things, supported Hansen's statements concerning the Forthcoming Real Estate Transaction and because they suggested the Forthcoming Real Estate Transaction would occur, they are false statements. Additionally, while present or on the telephone, Hansen made false statements about how transactions with Conte would qualify Brinton for the Forthcoming Real Estate Transaction. These statements went uncontroverted and uncorrected by Conte, permitting Brinton to believe that Conte was helping to qualify him for that transaction.

260.    On February 27, 2017, at Halliday's office, Halliday made representations that he would fund the properties involved in the Forthcoming Real Estate Transaction, but in fact he had neither the means nor the intention of funding them. In or around September of 2016, over the telephone from Florida to Utah, Odenath represented that he was putting together the Forthcoming Real Estate Transaction and had adequate funds and had purchasers available, but in fact he had no such funding or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction. Branden Hansen, to aid Conte in his tax evasion scheme, was the ultimate transferor of many the properties to Plaintiffs.

261.    In addition, at different times while Odenath and Halliday were present or on the telephone, Hansen made false statements about the efforts Odenath, Fairchild and

Halliday were presently undertaking to assemble and fund the properties involved in the Forthcoming Real Estate Transaction. Despite the fact that Odenath, Fairchild, and Halliday were taking no steps to assemble or fund the properties involved in the Forthcoming Real Estate Transaction, these statements went uncontroverted and uncorrected by Conte, permitting Brinton to believe that Odenath, Fairchild and Halliday were working to assemble and fund the properties to be involved in the Forthcoming Real Estate Transaction.

262.    All of these representations and omissions were false and misleading, and Conte, Hansen, Odenath, Fairchild, and Halliday knew them to be false or made them recklessly, knowing that they were not performing the acts asserted, and they otherwise had insufficient knowledge on which to base these representations. These Defendants made these representations with the purpose of inducing Brinton to act on them by participating in the Transactions. Brinton did not know the false nature of the misrepresentations and reasonably relied on them by in fact participating in the real estate transactions at issue. Brinton was injured in that he unknowingly traded properties of higher value for properties of lower value in the belief he would recoup his investment through the Forthcoming Real Estate Transaction, which he has not been able to participate in.

263.    Plaintiffs have been damaged, through the loss of their income and assets invested in reliance on the Forthcoming Real Estate Transaction, in an amount to be proven at trial, not less than $20,000,000.

264.    These acts of the Defendants were willful and malicious, intentionally fraudulent, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of others. Thus, punitive damages should be awarded.

### D. CLAIM FOUR: State Law Fraud Regarding Management of the Properties – Against Hansen, Grande, Manriquez, Garcia, Estrella Entities.

265. Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

266. Conte represented to Brinton that Manriquez, Garcia, and Grande were honest and competent property managers. These representations were false. Conte made these representations knowing they were false or knowing there was insufficient knowledge upon which to base such representations. Conte made the representations for the purpose of inducing Brinton to act on them by hiring property managers that were loyal to Conte and the other Defendants. Brinton, acting reasonably and in ignorance of the falsity of these statements did in fact rely upon them by hiring Manriquez, Garcia, and Grande as his property managers. This act of reliance injured and damaged Brinton in that Manriquez, Garcia, and Grande diverted and depleted assets and income under management from Plaintiffs and failed to use these funds to pay the mortgage and lease payments due. These acts caused various parties to claim Plaintiffs were and are in default on several mortgages and leases with option-to-buy.

267. Hansen represented to Brinton that he was an honest and competent property manager. These representations were false. Hansen made these representations knowing they were false. Hansen made the representations for the purpose of inducing Plaintiffs to act on them by hiring him as a property manager. Plaintiffs, acting reasonably and in ignorance of the falsity of these statements did in fact rely upon them by hiring Hansen or the Estrella Entities or another entity controlled by Hansen as their property manager. This act of reliance injured and damaged Plaintiffs in that Hansen diverted and depleted property assets and income from them, which caused various parties to claim Plaintiffs were and are in default on several mortgages and leases with option-to-buy.

268.    These frauds damaged Plaintiffs in that they unknowingly hired corrupt managers who were working not in their best interests, but for Conte and Hansen, and who diverted income and assets under management, and permitted mortgages and leases to go unpaid, leading to further damage in the form of eviction, foreclosure, and loss of options to purchase. Plaintiffs have been damaged in an amount to be proven at trial, not less than $20,000,000.

269.    These acts of the Defendants were willful and malicious, intentionally fraudulent, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of others. Thus, punitive damages should be awarded.

### E.    CLAIM FIVE: State Law Fraud Regarding the Values of the Properties Exchanged to Plaintiffs – Against Hansen.

270.    Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

271.    Conte and Hansen represented to Brinton the values of the properties purchased by Plaintiffs in the Transactions were higher than they actually were. These representations were false. Conte and Hansen made these representations knowing they were false or knowing there was insufficient knowledge upon which to base such representations. Conte and Hansen made the representations for the purpose of inducing Plaintiffs to act on them by purchasing the properties at inflated prices. Plaintiffs, acting reasonably and in ignorance of the falsity of these statements did in fact rely upon them by purchasing the properties at the price requested. This act of reliance injured and damaged Plaintiffs in that Plaintiffs paid more money for the properties than they were worth or exchanged properties of greater value than the exchange was worth. Plaintiffs have been damaged in an amount to be proven at trial, not less than $20,000,000.

272.    These acts of the Defendants were willful and malicious, intentionally fraudulent, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of others. Thus, punitive damages should be awarded.

   **F.** **CLAIM SIX: State Law Conversion – Against Hansen, Branden Hansen, Turner, Munoz, Grande, Manriquez, Garcia, Quayle, Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.**

273.    Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

274.    As set forth above, Hansen, Grande, Manriquez, Munoz, Garcia, Quayle, Branden Hansen and Turner served on the management team of real properties and/or gas stations/convenience stores on behalf of the Plaintiffs, acting personally and through the Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and/or Junction VII.

275.    In their capacity as managers, these Defendants were entrusted with the income and assets of the respective properties and gas stations/convenience stores which they managed.

276.    As alleged above, these Defendants took the income from the properties and gas stations/convenience stores and diverted it to their own use and that of the other Defendants. These Defendants were under entrusted with these particular funds to use to pay expenses (including mortgage and lease payments) and to preserve the balance for the Plaintiffs.

277.    As alleged above, these Defendants also took personal property and inventory from the properties and gas stations/convenience stores and diverted it to their own use or that of the Defendants.

278.    By diverting the income and assets of the Plaintiffs to their own use, these Defendants converted these assets and specific funds to their own use and benefit.

279.    Plaintiffs were harmed by the amount of funds diverted, the value of inventory and assets diverted, and by the foreclosures, evictions, and loss of options to purchase in certain leases. Plaintiffs have been damaged in an amount to be proven at trial, not less than $20,000,000.

280.    These acts of the Defendants were willful and malicious, intentionally fraudulent, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of others. Thus, punitive damages should be awarded.

### G.    CLAIM SEVEN: State Law Breach of Fiduciary Duties – Against Hansen, Branden Hansen, Turner, Munoz, Grande, Manriquez, Garcia, Quayle, Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.

281.    Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

282.    As set forth above, Hansen, Grande, Manriquez, Munoz, Garcia, Quayle, Branden Hansen and Turner served on the management team of real properties and/or gas stations/convenience stores on behalf of the Plaintiffs, personally and through the Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and/or Junction VII.

283.    In their capacity as managers, these Defendants owed fiduciary duties to the Plaintiffs.

284.    As alleged above, these Defendants took the income from the properties and gas stations/convenience stores and diverted it to their own use and that of the other Defendants. These Defendants were entrusted with these particular funds to use to pay expenses (including mortgage and lease payments) and to preserve the balance for the Plaintiffs.

285.    As alleged above, these Defendants also took personal property and inventory from the properties and gas stations/convenience stores and diverted it to their own use or that of the Defendants.

COMPLAINT

286.    By diverting the income and assets of the Plaintiffs to their own use, these Defendants breached their fiduciary duties and thereby damaged Plaintiffs in the value of the income and assets diverted. In addition, these Defendants damaged Plaintiffs by failing to use the funds to pay mortgage and lease payments, placing Plaintiffs in default, and impairing Plaintiffs' options to purchase under the various leases. Plaintiffs have been damaged in an amount to be proven at trial, not less than $20,000,000.

287.    These acts of the Defendants were willful and malicious, intentionally fraudulent, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of others. Thus, punitive damages should be awarded.

### H.    CLAIM EIGHT: State Law Conspiracy – Against all Defendants other than Perry and Weller.

288.    Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

289.    As set forth above, the Defendants conspired to achieve the fraudulent purposes set forth in Counts 3 through 7 of this Complaint, specifically to: i) convince Brinton that the Forthcoming Real Estate Transaction was a real opportunity for which Brinton could qualify by doing business with Defendants; ii) convince Brinton to enter into the Transactions whereby he overpaid for real properties; and ii) convince Plaintiffs to install managers loyal to the Defendants, rather than Plaintiffs. As a further part of this conspiracy, these managers would then divert assets from the Plaintiffs' real estate and gas station/convenience store operations to the uses of the Defendants, which would deprive the Plaintiffs of funds to pay their lease and mortgage obligations. As the Defendants did not notify Plaintiffs of the various impending defaults, this allowed the lessor/mortgagee, Conte, the ability to evict, foreclose, or cancel options to purchase. The other Defendants did these acts to further another aim of the conspiracy: to promote Conte's interest in reclaiming the properties they had traded, sold, or leased to Plaintiffs.

COMPLAINT

290.   Larsen conspired with Hansen and/or the other Defendants to lend legitimacy to their enterprise. Larsen came to the attention of Brinton on or about November 1, 2017 when he asserted himself to be the leader of the "Entertainment Group" as that term is used in the settlement between Brinton and Conte referenced above. His role in the conspiracy has been to further conceal the efforts of the other Defendants by making it appear that they have the backing of a legitimate businessperson/investor and knowledgeable accountant. Larsen's agreement to join the conspiracy is evident by his negotiations with Brinton concerning the settlement with Conte, his execution of a guarantee on the Partial Settlement with Hansen

291.   The Defendants' meeting of the minds is demonstrated by their cooperation in convincing Brinton of the reality of the Forthcoming Real Estate Transaction, as well as their cooperation in placing property managers to further embezzle funds and fail to pay leases and mortgages allowing Conte, Trophy, Perry and Weller to claim properties were and are in default.

292.   As alleged above, each Defendant has personally made fraudulent statements, fraudulent omissions, and/or embezzled money from Plaintiffs in furtherance of this conspiracy.

293.   Plaintiffs have been damaged by this conspiracy in that they have overpaid for real estate, seen their income and assets embezzled, and ultimately lost properties and been placed into claimed default through the actions of the Defendants. Damages will be proved at trial in an amount not less than $20,000,000.

> I.   **CLAIM NINE: State Law Negligent Misrepresentations Regarding Forthcoming Real Estate Transaction – Against Hansen, Fairchild, Odenath and Halliday.**

294.   Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

295.    Hansen represented to Brinton that the Forthcoming Real Estate Transaction was presently being assembled by Odenath, with the assistance of Fairchild, and that it was being assembled to provide Brinton with the opportunity to double his money. Hansen represented to Brinton that the purchasers involved in the Forthcoming Real Estate Transaction would purchase the properties at a Cap Rate that was half the Cap Rate at which Brinton had purchased the properties in question. Hansen further represented that by entering into the real estate transactions at issue with Conte, Brinton would be taking present steps to qualify to have the opportunity to participate in the Forthcoming Real Estate Transaction. Hansen further represented that Halliday was presently gathering and would provide the necessary funding for the properties to be involved in the Forthcoming Real Estate Transaction.

296.    Hansen had a duty to disclose the truth to Brinton: that Hansen had no knowledge of a legitimate Forthcoming Real Estate Transaction. Hansen breached that duty, which breach proximately caused Brinton to enter into unfavorable real estate transactions with Conte, Trophy, Perry, and Weller, he otherwise would not have entered into. Plaintiffs suffered injury and damages in that they purchased several real properties at grossly inflated prices, and accepted managers who were loyal to Conte, not Plaintiffs, and committed the malfeasance outlined above. Hansen's breach also caused Brinton to not seek financing to cover lease payments on the properties subject to the transactions at issue because Brinton believed, based on the above-referenced promises, that the Forthcoming Real Estate Transaction was imminent, which would provide him with the ability to exercise the lease options and/or sell the properties for at least double the price Plaintiffs paid for the properties.

297.    In or around September of 2016, over the telephone, Odenath represented that he was assembling the Forthcoming Real Estate Transaction and had funding and

purchasers available, but he had no such funding or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction.

298.    Odenath had a duty to disclose the truth to Brinton: that Odenath had no intention of assembling the Forthcoming Real Estate Transaction. Odenath breached that duty, which breach proximately caused Brinton to enter into unfavorable real estate transactions with Conte, Trophy, Perry, and Weller, he otherwise would not have entered into. Plaintiffs suffered injury and damages in that they purchased several real properties at grossly inflated prices, and accepted managers who were loyal to Conte, not Plaintiffs, and committed the malfeasance outlined above. Odenath's breach also caused Brinton to not seek financing to cover lease payments on the properties subject to the transactions at issue because Brinton believed, based on the above-referenced promises, that the Forthcoming Real Estate Transaction was imminent, which would provide him with the ability to exercise the lease options and/or sell the properties for at least double the price Plaintiffs paid for the properties.

299.    In or around September/October of 2016, over the telephone, Fairchild represented that he was assisting Odenath in assembling the Forthcoming Real Estate Transaction and that Odenath had funding and purchasers available, but in fact Odenath had no such funding or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction.

300.    Fairchild had a duty to disclose the truth to Brinton: that Odenath had no intention of assembling the Forthcoming Real Estate Transaction and that Fairchild had no intention of assisting Odenath in assembling the Forthcoming Real Estate Transaction. Fairchild breached that duty, which breach proximately caused Brinton to enter into unfavorable real estate transactions with Conte, Perry, and Weller, which he otherwise would not have entered into. Plaintiffs suffered injury and damages in that they purchased several real properties at grossly inflated prices, and accepted managers who

were loyal to Conte, not Plaintiffs, and committed the malfeasance outlined above. Fairchild's breach also caused Plaintiffs to not seek financing to cover lease payments on the properties subject to the transactions at issue because Brinton believed, based on the above-referenced promises, that the Forthcoming Real Estate Transaction was imminent, which would provide him with the ability to exercise the lease options and/or sell the properties for at least double the price Plaintiffs paid for the properties.

301.    On February 27, 2017, at Halliday's office, Halliday made representations that he would fund the properties that were to be involved in the Forthcoming Real Estate Transaction, but he had neither the means nor the intention of funding them.

302.    Halliday had a duty to disclose the truth to Brinton: that Halliday had no intention or means of funding the properties to be involved in the Forthcoming Real Estate Transaction. Halliday breached that duty, which breach proximately caused Brinton to enter into unfavorable real estate transactions with Conte he otherwise would not have entered into. Plaintiffs suffered injury and damages in that they purchased several real properties at grossly inflated prices, and accepted managers who were loyal to Conte, not Plaintiffs, and committed the malfeasance outlined above. Halliday's breach also caused Brinton to not seek financing to cover lease payments on the properties subject to the transactions at issue because Brinton believed, based on the above-referenced promises, that the Halliday funding was imminent, which would provide him with the ability to exercise the lease options and/or sell the properties for at least double the price Brinton paid for the properties.

303.    The fictitious funding from Halliday never materialized, causing Brinton to allegedly be in default on the leases and causing him to potentially lose the options to purchase on the leased properties.

**J.      CLAIM TEN: Breach of Contract Regarding Property Management Services – Against Hansen, Branden Hansen, Turner, Munoz, Grande, Manriquez, Garcia, Quayle, Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.**

304.   Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

305.   There existed valid management contracts between Plaintiffs and Defendants such that:

- Hansen was ultimately in charge of managing all properties and gas stations addressed herein on behalf of Plaintiffs.

- Branden Hansen was an executive manager over the various gas station properties owned by Plaintiffs.

- Grande managed real properties in New York on behalf of Plaintiffs Dewey, ROC, and East Main.

- Manriquez managed Four Oaks, Silverwood, Whispering Oaks, McKinley Court, The Cove, Bradford Townhomes, and Sierra Point on behalf of Plaintiffs.

- Garcia managed Highland Oaks Property on behalf of Plaintiff Highland Oaks.

- Quayle managed the gas station properties in Utah and Idaho, on behalf of Plaintiffs.

- Turner and Munoz assisted in the management efforts as indicated above.

306.   Plaintiffs performed their obligations under these contracts by paying Defendants Hansen, Garcia, Grande, Quayle, Branden Hansen, Munoz, Turner, and Manriquez for their services, performed individually and on behalf of the Estrella Entities, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.

307.    These Defendants breached the contracts by diverting and depleting property assets and income in a dishonest and incompetent manner, leaving insufficient funds to pay mortgage and lease payments, and failing to notify Brinton of the impending defaults. Brinton suffered damages as a result in the amount of the assets and income so depleted and diverted, plus consequential damages including those related to unpaid mortgage and lease payments, which amount will be proven at trial but is at least $20,000,000.

K.      **CLAIM ELEVEN: Promissory Estoppel – Against Halliday and Odenath.**

308.    Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

309.    In or around September of 2016, over the telephone, Odenath represented that he was assembling the Forthcoming Real Estate Transaction and had funding and/or purchasers available, but in fact he had no such funding and/or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction.

310.    Brinton acted with prudence and in reasonable reliance on Odenath's representation by entering into unfavorable real estate transactions with Conte he otherwise would not have entered into in order to qualify for the Forthcoming Real Estate Transaction. Odenath knew that Brinton was relying on his promise. Odenath knew that he had no intention of assembling the Forthcoming Real Estate Transaction.

311.    In or around September/October of 2016, over the telephone, Fairchild represented that he was assisting Odenath in assembling the Forthcoming Real Estate Transaction and that Odenath had funding and/or purchasers available, but in fact Odenath had no such funding and/or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction.

312.   Brinton acted with prudence and in reasonable reliance on Fairchild's representation by entering into unfavorable real estate transactions with Conte he otherwise would not have entered into in order to qualify for the Forthcoming Real Estate Transaction. Fairchild knew that Brinton was relying on his promise. Fairchild knew that he had no intention of assisting Odenath in assembling the Forthcoming Real Estate Transaction.

313.   On February 27, 2017, at Halliday's office, Halliday made representations that he would fund the properties to be involved in the Forthcoming Real Estate Transaction, but in fact he had neither the means nor the intention of funding them.

314.   Brinton acted with prudence and in reasonable reliance on Halliday's and Odenath's representations by not seeking financing to cover lease payments on the properties subject to the transactions at issue because Brinton believed, based on the above-referenced promises, that the Halliday financing and the Forthcoming Real Estate Transaction were imminent, which would provide him with the ability to exercise the lease options and/or sell the properties for at least double the price Plaintiffs paid for the properties. The fictitious Halliday funding and Forthcoming Real Estate Transaction never materialized, causing Brinton to allegedly be in default on the leases and causing him to potentially lose the options to purchase on the leased properties. Halliday, Fairchild and Odenath knew that Brinton was relying on their promises. Halliday also knew that he had no intention of funding the properties to be involved in the Forthcoming Real Estate Transaction and Defendants Odenath and Fairchild also knew that they had no intention of assembling, or assisting in assembling, respectively, any Forthcoming Real Estate Transaction.

315.   Plaintiffs were damaged by relying on these promises in an amount to be proven at trial, but not less than $20,000,000.

L.     **CLAIM TWELVE: Utah's Pattern of Unlawful Activity Act, UCA § 76-10-1601 et seq. ("*Utah Act*") – Against Hansen, Halliday, Estrella Group, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.**

316.   Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

317.   Hansen, Halliday, and the entities they control, along with the conspiracy Defendants as set forth in Claim Thirteen, set up the enterprise described above as the Conte/Hansen Enterprise. These Defendants are associated in fact as an enterprise, as evidenced by the cooperation to pursue their ends alleged above.

318.   Each of these Defendants is associated with the Conte/Hansen Enterprise, whose affairs they conduct by means of the fraud and conversion alleged above.

319.   At all times relevant, each of these Defendants were individuals or legal entities capable of holding a legal or beneficial interest in real property.

320.   Each of the counts of fraud and conversion constitutes a Theft by Deception under UCA § 76-6-405. Through the frauds alleged above, Defendants used deception to take ownership of the Seven Peaks Provo Property as well as Plaintiffs' funds, and also took management control of numerous properties and business of Plaintiffs. Defendants did so with an intent to deprive Plaintiffs of their property.

321.   In furtherance of this enterprise, and to obtain property of the Plaintiffs, these Defendants deceived Plaintiffs into believing the following false statements.

- The value of the properties to be transferred to Brinton were greater than they were;

- Brinton's participation in the transactions at issue would result in an opportunity to participate in the Forthcoming Real Estate Transaction;

- The Cap Rate applicable to the Forthcoming Real Estate Transaction would be no more than half the Cap Rate used to calculate the purchase prices of

the properties Plaintiffs acquired in the Transactions, creating the opportunity for Plaintiffs to double their investments;

- Brinton would achieve a 100% return on his investment when he eventually participated in the Forthcoming Real Estate Transaction;

- Halliday was planning to fund the properties to be involved in the Forthcoming Real Estate Transaction;

- Odenath, with assistance from Fairchild, was actively working to assemble buyers for the Forthcoming Real Estate Transaction;

- Hansen or Conte in fact owned all the properties exchanged to Brinton;

- Hansen would be an honest and competent property manager;

- Grande would be an honest and competent property manager;

- Manriquez would be an honest and competent property manager;

- Garcia would be an honest and competent property manager.

- Munoz would be an honest and competent property manager.

- Quayle would be an honest and competent property manager.

- Turner would be an honest and competent company treasurer.

322. In addition, the Defendants purported to borrow money on behalf of Plaintiffs from Perry and/or Weller when all Defendants knew this was unauthorized and purported to give Perry and/or Weller claims to Plaintiffs' assets and income.

323. These multiple deceptions and the multiple avenues of deception (deception as to property value, deception as to management services, deception as to the Forthcoming Real Estate Transaction) form a pattern of unlawful activity by which the Conte/Hansen Enterprise is conducted.

324. The unlawful operation of the Conte/Hansen Enterprise has caused damage to Plaintiffs in that Plaintiffs have overpaid for real properties and businesses and allowed Defendants to mismanage these properties and businesses and embezzle from them.

COMPLAINT

325.   As a result of Defendants' conduct, as alleged in this complaint, Plaintiffs have been damaged in an amount to be proven at trial but not less than $20,000,000.

### M.   CLAIM THIRTEEN: Conspiracy to Violate the Utah Act – Against Defendants Hansen, Branden Hansen, Munoz, Turner, Hanna, Halliday, Odenath, Grande, Manriquez, Garcia, Quayle, Warwood, Peterson, Enloe, Weller, Perry, Fairchild, Bank, Estrella Group, Zurich, Heathrow, Flintshire, Low Cost, and Junction VII.

326.   Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

327.   At all times relevant, each of these Defendants were individuals or legal entities capable of holding a legal or beneficial interest in real property.

328.   Plaintiffs allege that commencing from at least February 2016, and continuing until the present day, Hansen, Branden Hansen, Munoz, Turner, Hanna, Halliday, Odenath, Grande, Manriquez, Garcia, Quayle, Warwood, Peterson, Enloe, Weller, Perry, Fairchild, Bank, and the Entity Defendants conspired to violate Utah Act §1603(3) *i.e.*, each defendant agreed to conduct or participate in the affairs of the Enterprise, through a pattern of unlawful activity, as more fully described in Claim Twelve. Plaintiffs allege that the conspiratorial objective of that mutual agreement between these conspiracy Defendants was intended to obtain Plaintiffs' interests in business and property, and that such conspiratorial conduct violates Utah Act section 1603(4).

329.   Each conspiracy Defendant intended to further the schemes to defraud, which as described in Claim One, were completed and satisfied by the substantive individual Defendants Hansen and Halliday.

330.   It was a part of the conspiracy that each conspiracy participant agreed that Conte, and Defendants Hansen and Halliday would commit a pattern of unlawful activity as more fully alleged in Claim Twelve above, in the conduct of the affairs of the enterprise.

The agreement to violate the Utah Act with regard to each conspiracy defendant is as follows:

- As described above, conspiracy defendants Odenath, Fairchild, agreed that Hansen and Conte would engage in multiple acts of theft by deception/fraud associated with the misrepresentations regarding the Forthcoming Real Estate Transaction;

- Quayle, Turner, and Munoz agreed that the Hansens would participate in the false and non-existent Forthcoming Real Estate Transaction scheme. There are numerous e-mails between Brinton and Conte/Hansen where Turner and Munoz were copied, see., e.g., e-mail dated June 3, 2016, from Brinton to Hansen, in which Munoz and Turner were copied, titled "Dewey," in which the ZibalStar L.C. purchase contract for Dewey is discussed;

- Hanna, Grande, and Manriquez agreed that Conte and Hansen would defraud Plaintiffs by embezzling monies from Plaintiffs' properties so as to force Plaintiffs into default thereby allowing Conte to foreclose on the properties. In fact, Manriquez is on texts with Brinton and Hansen/Conte regarding the operation of the properties. See, e.g., text dated November 17, 2016 involving Brinton, Conte, and Manriquez in which it is discussed that Manriquez needs to run the properties because Ted's staff is not competent. There is another text, dated December 8, 2016, between Conte, Hansen, Manriquez and Brinton in which it also discussed that Manriquez needed to be in charge of everything regarding operation of the properties. In each text, these are misrepresentations designed to have Manriquez mis-manage the properties so that the lessee Plaintiffs would be driven to default on their lease payments.

- As described *supra.*, paras. 190-198, Turner, Munoz, and Branden Hansen, agreed that substantive defendant Ten Hansen, would without authorization automatically affix Bryan Brinton's signature to checks without his knowledge for the purpose of "check-kiting," which caused the hiding of the scheme from Plaintiffs. Warwood, Peterson, and the Bank participated and furthered this fraud. See, *supra.*, para. 193. Turner also drafted the July 8, 2016 e-mail forwarding Ten Hansen's overstatements of the values of Tres Palms, Manzana Grove, and Sierra Pointe properties.

- Weller worked with Hanna, Perry, and Hansen with regard to the misrepresentations regarding Blue Fun. See, *supra.*, para. 213-14; and

- In or around September of 2016, over the telephone, Odenath misrepresented to Brinton that he was assembling the Forthcoming Real Estate Transaction and had funding and purchasers available, but in fact he had no such funding or purchasers and made no efforts to assemble the Forthcoming Real Estate Transaction; see *supra.*, para. 72.

## 2. Proximate Cause and Injury

331.    As a result of Defendants' agreement that conspirators would commit a pattern of unlawful activities, Plaintiffs sustained economic damages.

332.    But for Defendants' agreement that conspirators would commit predicate unlawful activities, Plaintiffs would not have sustained economic and non-economic damages.

333.    Defendants' agreement that conspirators would commit unlawful activities, *i.e.*, the thefts by deception, was a direct and proximate cause of Plaintiffs sustained economic damages, as described above.

### N.    CLAIM FOURTEEN: Alter Ego – Against All Defendants except Bank, Warwood, and Peterson.

334.   Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs re-allege and incorporate by reference each of the allegations made in the preceding paragraphs as though the allegations were fully set forth herein.

335.   For the reasons alleged above, there is a unity of interest and ownership between the Individual Defendants and the Entity Defendants such that their separate personalities no longer exist.

336.   On information and belief, the Entity Defendants are not operated as true entities, but are undercapitalized, do not pay dividends, allow funds to be siphoned by the dominant Individual Defendant shareholder(s), and do not have functional officers or directors.

337.   On information and belief, the Individual Defendants operate the Entity Defendants as a façade for their own operations.

338.   The Individual Defendants use the Entity Defendants to promote the frauds alleged above.

339.   Plaintiffs seek a finding that the Entity Defendants are alter egos of the Individual Defendants, who are personally liable for their obligations as proven in this action.

## VI.    JURY DEMAND

340.   Plaintiffs request that the Court set this case for a jury trial.

## VII.    PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court set this case for trial and that the Court grant Plaintiffs the following relief against Defendants, jointly and severally, as follows:

A.    Compensatory damages to be proven at trial;

B.    Exemplary, treble, double, and statutory damages to be proven at trial;

C.    Recession of the transfers of the Courtside and Seven Peaks Provo properties;

D.      Attorneys' fees and costs of suit;

E.      Pre-judgment interest at the maximum rate allowed by law; and

F.      Such other and further relief as the Court deems just and proper.

DATED: May 30, 2018            PIA ANDERSON MOSS HOYT

By: _____
    Scott R. Hoyt
    John P. Mertens
    *Attorneys for Plaintiffs*

COMPLAINT